**DAWN L. and Michael L., on their own behalf and on behalf of their daughter ML, a minor, Plaintiffs,**

v.

**GREATER JOHNSTOWN SCHOOL DISTRICT, Defendant.**

**Civil Action No. 3:06–19.**

United States District Court, W.D. Pennsylvania.

Nov. 13, 2008.

334

Edward A. Olds, Richard S. Matesic, Pittsburgh, PA, for Plaintiffs.

John W. Smart, Andrews & Price, Pittsburgh, PA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KIM R. GIBSON, District Judge.

## I. FINDINGS OF FACT

The above-captioned action is brought pursuant to Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681(a) *et seq.* Plaintiffs in this case are Dawn L. and Michael L. on their own behalf and on behalf of their minor daughter M.L. Defendant is the Greater Johnstown School District (hereinafter the District). Plaintiffs claim that the District, a recipient of federal funds, Vol. 5 pp. 39–

40, violated M.L.'s rights under Title IX by its unreasonable response to notice of sexual harassment of M.L. by another student, A.M., in January and February of 2005, thereby causing M.L. to suffer injury. Dawn and Michael L. also claim that the District violated their rights under Title IX by retaliating against them for opposing the District's allegedly unreasonable response to their notice of sexual harassment of M.L. by A.M. and in particular for filing the instant action.

At all times relevant to this case, the L. family was composed of Dawn and Michael L. and their four minor children. Vol. 2 pp. 39–40. Dawn and Michael L. are both lifelong residents of Johnstown, Pennsylvania and both attended District schools. *Id.* at 40; Vol. 4 pp. 124–25. Dawn L. is a full-time mother who has occasionally worked outside the home. Vol. 2 pp. 41–42. Michael L. is a crane operator. Vol. 4 p. 125. He was, however, disabled from approximately the beginning of June, 2003 until October 1, 2007. *Id.* at 125–27. While disabled, Michael L. received disability payments; the L. family's income during Michael's period of disability was approximately $2,300 to $2,600 per month. *Id.* at 129.

Dawn and Michael L. first became involved with the District as volunteers in approximately 1996, in conjunction with their eldest daughter's enrollment in the District. *Id.* at 132. From that time until February of 2006 they chaperoned, coached, tutored, worked on yearbooks, worked at concession stands, stood in for other parents at school events, participated in various booster organizations, served on parent-teacher committees, and ultimately served as officers in the Big J, the parent booster organization for all of the high school-level booster groups.[1] Vol. 2 pp. 42–47; Vol. 3 pp. 92–93, 95–98; Vol. 4 pp. 131–37, 177–78; Joint Ex. 1 ¶ 44. Indeed, Dawn L. testified that she spent more time volunteering than she would have spent at a full-time job. Vol. 3 pp. 95–96.

Dawn L. was also employed by the District as a teacher's aide during the 2002–2003 school year. Joint Ex. 1 ¶ 47.[2] Michael L. was hired by the District's varsity girls' basketball coach to keep score during the 2005–2006 season but was dismissed at approximately the same time as the L. family filed the instant action and has never been paid for the games he worked. *Id.* at ¶¶ 49–51.

M.L. was born on January 31, 1993.[3] She was first designated as gifted in the second grade and for the remainder of her enrollment in the District was subject to a Gifted Individualized Education Program (hereinafter GIEP) which was revised annually to reflect her needs. Vol. 2 p. 56; Vol. 3 pp. 23–24; Vol. 4 p. 138; Ex. 10 pp. 10–89.[4] At approximately the same time as her designation as a gifted student M.L. developed problems communicating and otherwise interacting with others. Vol. 1

---

1. The Big J was technically independent of the District, but raised money in support of activities sanctioned by the District; operated its concession stands on District property; paid approximately 25 percent of its revenues to the District; and was subject to the District's clearance policies. Vol. 2 pp. 44–47; Vol. 4 pp. 9–10.

2. Joint Exhibit 1 contains the facts to which the Parties have stipulated.

3. The Court acknowledges the general proscription against disclosure of more than the year of a person's birth. Fed.R.Civ.P. 5.2(a)(2). The rule does, however, permit the Court to "order[] otherwise...." *Id.* As will be seen *infra*, the month and day of M.L.'s birth are necessary pieces of evidence in this case, and the Court will therefore exempt them from the general redaction requirement.

4. Plaintiffs' exhibits are numbered; Defendants' are lettered.

pp. 115–17; Vol. 2 pp. 50–51. These problems were so severe that she could not make a purchase in a store or order food for herself in a restaurant. Vol. 1 p. 115; Vol. 2 p. 54; Vol. 4 p. 116. She would also refuse to speak in school; at least one of her elementary school teachers ultimately had to require her to at least say "goodbye" before allowing her to go to her next class or she would not speak at all. Vol. 2 p. 52. It was difficult for M.L. to make friends; there were "usually [only] one or two people out of a group that she would be able to become friends with . . . ." Vol. 4 p. 138; *see also* Vol. 2 pp. 54–55. M.L. was also a "private person" who on at least one occasion refused to change her clothes behind the closed door of her bedroom because she could not lock the door. Vol. 4. p. 141.

Various mental health professionals have offered multiple diagnoses for M.L.'s condition, including social phobia, anxiety, selective mutism, and intellectual snobbery. Vol. 2 p. 51. By the fall of 2004 M.L. had also been evaluated for Asperger's Syndrome, a form of autism, and her parents had been counseled about how to deal with a child who suffered from that disorder. *Id.* at 69–73. Dawn and Michael L. were advised at that time that the condition could not be treated with medication and M.L. would likely always suffer from "severe social deficits." *Id.* at 72.

M.L. initially met A.M. through her older sister, N.L. Vol. 1 p. 119; Vol. 4 p. 112. Despite the fact that A.M. was two years older than M.L. the two girls had become best friends by the summer of 2004. Vol. 2 pp. 15, 67. M.L. did not, however, think of A.M. in a romantic or sexual way, Vol. 1 pp. 126–27; *see also* Vol. 4 pp. 31, 158, and roughly contemporaneous photographs of M.L. depict a sexually undeveloped little girl who was too physically immature for any form of sexual ideation. Ex. 74–75; Vol. 2 pp. 4–5; Vol. 4 p. 149.

A.M. lived near the L. family with her mother, Paula B.; sometimes A.M.'s older brother lived with them as well. Vol. 1 p. 121; Vol. 2 pp. 62–62–63; Vol. 4 pp. 142–43. In the summer of 2004 A.M. began to spend a great deal of time with the L. family and with Paula B.'s approval essentially moved in with them. Vol. 2 pp. 65–67; Vol. 4 pp. 121–22, 142–44; Joint Ex. 1 ¶ 3. She ate with the family, helped with household chores, and joined the family on outings, vacations, and in church. Vol. 2 pp. 65–67; Vol. 4 pp. 143–44. She also slept at the L. house almost every night that summer, sharing a room with N.L. and M.L. and sometimes sharing a bed with M.L. Vol. 1 pp. 120–22; Vol. 2 p. 77.

In the fall of 2004 A.M. was preparing to enter eighth grade and M.L. to enter sixth grade, both at the District's middle school. Vol. 2 p. 67. Shortly before classes were to begin, while M.L. and A.M. were sharing a bed, A.M. attempted to unbuckle and remove M.L.'s belt. Vol. 1 pp. 123, 125. M.L. woke up and turned away from A.M. Neither girl said anything and M.L. went back to sleep. *Id.* at 124. Although "shocked," M.L. did not tell anyone what had happened. *Id.*

From the time of her initial attempt to remove M.L's belt until January 18, 2005 A.M. kissed and fondled M.L., touched M.L.'s breasts, rubbed her crotch against M.L. and digitally penetrated M.L.'s vagina. Vol. 1 pp. 125–26; Vol. 3 p. 77. A.M. also "want[ed]" to put her mouth on [M.L.'s] crotch," although the record does not indicate whether A.M. actually did so. Vol. 1 p. 147. These actions took place at M.L.'s house, A.M.'s house, and in a bathroom at the middle school. *Id.* at 44; Ex. 5 pp. 3–5. The encounters in the school bathroom were planned; A.M. would write M.L. a note and M.L. would meet her there. Vol. 1 p. 139. M.L. did not enjoy this contact and did not want it to happen;

she never wanted to have sex with A.M. *Id.* at 42–43, 128–29. Indeed, she asked A.M. to stop every time A.M. initiated sexual contact but A.M. never did and M.L. ultimately "just gave up." Vol. 1 pp. 54, 128–29; Vol. 3 p. 41. M.L. did not, however, tell anyone about A.M.'s actions because she did not want A.M. to "get in trouble." Vol. 1 pp. 54, 129; Vol. 2 p. 20; *see also* Ex. CC–20a (mis-identified by counsel in the transcript as CC–4 at Vol. 2 p. 19). Under the circumstances of this case M.L.'s failure to report A.M.'s activities was "a normal reaction. . . ."[5] Vol. 1 p. 108.

M.L.'s parents knew nothing of A.M.'s sexual aggression and continued to treat her like a member of their family. Joint Ex. 1 ¶¶ 4–5, 15. When Paula B. refused to accompany A.M. to the open house at the middle school in the fall of 2004, Dawn and Michael L. "went to all of [A.M.'s] teachers' classes and [they] were the parent [sic]." Vol. 2 p. 67. A.M. continued to

call Dawn L.'s mother "gram" and "all of [the L.s'] extended family bought her gifts" at Christmas. *Id.* at 66. On one occasion, Christine Bulas, M.L.'s home-room and language arts teacher, testified that she phoned Dawn L. to let her know "that A.M. was walking by [Bulas's] class-room trying to get M.L.'s attention. . . ." Vol. 5 pp. 106–07. Ms. Bulas then testified that Dawn L. told Bulas that the two girls were friends and that A.M. "looked out" for M.L. *Id.* at 107; *see also* Joint Ex. 1 ¶ 5. Ms. Bulas could not, however, say when during the school year this exchange occurred; as will be obvious from the facts recited below, the Court finds that this conversation occurred before January 14, 2005.[6]

In December of 2004, Dawn L. received a phone call from James Mayes, M.L.'s science teacher, advising her that "he had found M.L. out in the hallway crying on a couple occasions," that "she wouldn't go into the cafeteria to eat," and that she

---

**5.** This opinion was offered by Johnstown Police Department Detective Julie Wagner, who was the District's school resource office during the 2004–2005 academic year. Vol. 1 p. 22; Joint Ex. 1 ¶ 28. Detective Wagner has a bachelor's degree in sociology and prior to joining the Johnstown Police Department worked as a youth advocate for the Cambria County Youth Advocate Program; as a case-worker and child protective services investigator for Cambria County Children and Youth Services; and as an incoming case-worker for the Department of Public Welfare. *Id.* She has "well over 200 hours of continuing education, training in the areas of interviewing children or interviewing victims in general, with the concentration of at least 100 hours in sexual abuse." *Id.* at 33. She is also certified by the Pennsylvania Department of Public Welfare as a "direct services work provider to children." *Id.* During her career Detective Wagner has interviewed more than 200 minor victims of sexual assault. *Id.* at 32–33.

In light of Detective Wagner's qualifications, and in the absence of any objection by

Defendant, the Court will consider Detective Wagner to be an expert on the subject of sexually abused minors. The Court will, however, refer to Detective Wagner throughout the remainder of its findings of fact and conclusions of law as "Officer Wagner," her rank at the time of the incidents about which she testified. *See* Vol. 1 pp. 22, 73.

**6.** Ms. Bulas's testimony was notable primarily for her near-total inability to recall the events about which she was being questioned. As explained in greater detail in n. 9, *infra*, the Court found it to be generally less than credible. Since, however, this account of her conversation with Dawn L. is consistent with the weight of the evidence if the conversation took place before January 14, 2005, the Court finds no reason to discount this portion of Bulas's testimony. *See also* Vol. 73 p. 183 (suggesting that Ms. Bulas's call to Dawn L., if it occurred, was in the "first part" of the 2004–2005 school year). In light of Dawn L.'s treatment of A.M. prior to January 13, 2005 as a member of her family, the Court also finds it of no significance that Dawn L. could not recall the conversation. *See id.*

refused to enter the cafeteria even if he offered to go with her. Vol. 2 pp. 73–74. He wanted Dawn L.'s permission get lunch for M.L. and take it to the middle school's office for M.L. to eat. *Id.* at 74. Dawn L. gave her permission, told Mr. Mayes about the possibility that M.L. had Asperger's syndrome, and asked Mr. Mayes to "keep [Dawn L.] posted." [7] *Id.*

On the afternoon of January 13, 2005, Dawn L. was cleaning M.L.'s room and found a letter from A.M. that "just didn't make sense. . . ." Vol. 2 pp. 75–76, 78; Ex. 1.3; Joint Ex. 1 ¶ 6. It seemed to Dawn L. to be overly affectionate and "didn't sit well." Vol. 2 pp. 77–78. Much of the note is illegible;[8] what remains reads as follows, with misspellings and grammatical errors preserved:

> Hey Baby wats up? nuffin much here well I thought u wouldnt go wit him if I ask you not too but okay I see how you are. remember when I would do stuff like [illegible] i got skills love you luvv I♥,ve y♥u *sooooo muchhh*
>
> Well got 2 go
> lots of love

Bye W/B

Ex. 1.3.

Dawn L. discussed the note with Michael L. and then attempted to call Paula B., A.M.'s mother. Vol. 2 p. 78. Paula B. did not answer the phone, so Michael drove Dawn the "couple blocks" to Paula's house. *Id.* at 78–79. While Michael waited in the car, Dawn spoke with Paula, who told Dawn that she had "seen sexually suggestive notes that had caused her to believe that 'the girls might be having a relationship' and 'that something had happened between the two girls.'" Joint Ex. 1 ¶ 10; Vol. 2 pp. 79–80; Vol. 3 p. 161. Paula also told Dawn that "her family would disown her if they thought A.M. was gay." Vol. 2 p. 80; Vol. 4 p. 32. Dawn took this to mean that a "sex act" might have occurred between A.M. and M.L. *Id.*; *see also* Joint Ex 1 ¶ 10. Dawn told Paula that A.M. was not to visit or phone the L. house or "talk to M.L. at all." Vol. 2 p. 79; Joint Ex. 1 ¶ 11.

In the evening of January 13, 2005 Dawn L. asked M.L. "if something had

---

7. Mr. Mayes testified that he could not remember ever seeing M.L. crying in school, let alone calling her mother. Vol. 5 p. 120. He did not, however, deny that it had happened and admitted that he had thousands of conversations with parents during his 35–year teaching career. *Id.* at 123–25.

Mr. Mayes has been retired for two years and lives in Somerset County. The District presumably has no power over him at this point and, since he lives outside the District, he will not be liable as a taxpayer for any judgment against the District. Nonetheless, after carefully observing his demeanor during his testimony the Court did not find him to be particularly credible and gives no weight to his inability to remember a conversation that remains vivid to Dawn L.

Moreover, the one item which Mr. Mayes claims to remember clearly is so inconsistent with every other bit of evidence in the case that it calls into question his entire testimony. He stated that at the end of the 2004–2005 school year he was called into the middle school office and shown a gift basket from the L. family with a card thanking the teachers on M.L.'s teaching team, Officer Wagner, and Principal Buchko. *Id.* at 121–22, 126. After listening to Dawn L.'s testimony regarding her interactions with Buchko during the second half of the 2004–2005 school year, it is inconceivable to the Court that she would have thanked Buchko for anything. Moreover, two of the five other teachers allegedly identified on the card as well as Detective Wagner and Principal Buchko himself were called as witnesses in this case, yet no further evidence was adduced about the gift basket either from them or Dawn and Michael L. The Court concludes from this that there was no evidence to adduce, and is therefore not inclined to credit Mr. Mayes's testimony about the basket or, indeed, anything else.

8. Dawn and Michael L. turned over the original notes from A.M. to the police and M.L.'s therapists. Vol. 4 p. 46.

happened between her and A.M." Vol. 2 p. 81. M.L. "just started crying." *Id.* at 81–82; Vol. 3 p. 162; Joint Ex. 1 ¶ 7. Although M.L. was not able to describe what had happened that night, Dawn "knew something was wrong" and told M.L. that she was to have no further contact with A.M. Vol. 2 p. 83; Joint Ex. 1 ¶ 9. Dawn also told her other children, without explanation, that A.M. was not allowed to call the L.'s house. Vol. 2 p. 83. In addition, since M.L. generally walked to school with A.M., Dawn told M.L. that from now on Dawn would drive M.L. to school. *Id.* at 84–85.

The next day, January 14, 2005, Dawn L. went to the middle school to talk to Principal Darren Buchko. Joint Ex. 1 ¶ 13. Buchko was charged with enforcing the District's sexual harassment policy as it pertained to students, including the prompt investigation of any complaints, and was in fact the person who was "ultimately responsible for anything that occur[red] in that building." Vol. 5 pp. 40–41, 51, 185, 188; Vol. 4 p. 63.

Dawn L. wanted to ensure "that A.M. would not be around M.L." She showed Buchko the note at Ex. 1.3 (see text *supra*) and another note that read as follows:

[A.M.],

I didn't want to go with C [a boy who was a friend of M.L.'s]. My mom made me. If I could've been with you I would've. And try not to make it worse for me please?¿ And I'll try to call you today or sumthin [illegible] my mom has to go somewhere with my dad. Well thatz all 4 now.

g2g byezz

Love,
[M.L.]

♥

Meet me at the corner so I can walk 2 school with you.
Ex. CC–19a (incorrectly identified by counsel in the transcript as Ex. CC–3); Vol. 2 pp. 87–92; Joint Ex. 1 ¶ 16.

Dawn L. also told Buchko about her conversation the previous evening with Paula B. and Paula B.'s concern that her family would disown her if they thought that A.M. was gay. Vol. 2 pp. 91–92; Joint Ex. 1 ¶ 18. In addition, Dawn told Buchko about M.L.'s psychological problems, including the phone call from Mr. Mayes and M.L.'s recent evaluation for Asperger's Syndrome. Vol. 2 p. 93; Vol. 4 p. 34. She asked Buchko to keep M.L. and A.M. separated, telling him that since she could not be in the building he "need[ed] to watch M.L." and that "someone [had] to protect [her] daughter" Vol. 2 pp. 92–94; Vol. 4 pp. 31, 35; Joint Ex. 1 ¶ 20. Buchko responded that "if he watched A.M. in that way" A.M.'s family could "come back on" him. Vol. 2 p. 94; Vol. 3 p. 174.

Buchko did, however, agree to go with Dawn L. to check M.L.'s locker for more notes. Joint Ex. 1 ¶ 19. Buchko called Ms. Bulas, M.L.'s homeroom teacher; placed her on speakerphone; told her that Dawn L. was with him in his office "and that there was a problem with M.L."; and asked for the number of and combination to M.L.'s locker. Vol. 2 p. 95. Ms. Bulas responded by asking Buchko if "everything [was] okay because ... M.L. [had] been coming back from the bathroom crying with her face beet red."[9] *Id.* at 96;

---

**9.** Ms. Bulas testified that she could not recall telling Dawn L. anything about M.L. returning from the bathroom with a red face. Vol. 5 p. 109. As noted in n. 6, *supra,* at trial Ms. Bulas could remember very little about M.L. in the 2004–2005 school year. After listening to Ms. Bulas's testimony and observing her demeanor on the witness stand, the

Court is not willing to conclude that the conversation did not take place merely because Bulas could not recall it.

Ms. Bulas appeared nervous and uncomfortable during her testimony to a degree far in excess of the discomfort an inexperienced witness might be expected to display. The

Vol. 3 p. 4. She went on to say that she had asked M.L. "if there was anything [Bulas] could do for her, and [M.L.] just said 'no' and kept putting her head down on the desk." Vol. 2 p. 96; Vol. 3 p. 4.

Ms. Bulas then furnished the number and combination of M.L.'s locker. Dawn L. and Buchko opened the locker and found several additional notes. *Id.* at 97; Joint Ex. 1 ¶ 19. At trial Dawn L. could not determine which if any of the notes in evidence were in the locker, but was certain that none of the notes in the locker had described graphic sexual activity. Vol. 2 pp. 98, 100, 206, 214; Vol. 3 p. 171. The notes from the locker did not change Buchko's mind about keeping A.M. away from M.L. and he neither offered to conduct an investigation nor discussed the District's policies regarding sexual harassment, which included the right to appeal a principal's decision to the District's superintendent. Vol. 2 pp. 98–99.

At trial Buchko did claim that he instructed M.L.'s teaching team to "keep an eye out" for M.L. and A.M., although he admitted that he had not given A.M.'s teachers similar instructions. Vol. 4 p. 75. He later claimed that in fact he only told one of the members off the team, Christine Bulas, and asked her to tell the rest of the team. *Id.* at p. 107. Ms. Bulas did testify that Buchko told her "at one time" to "keep [her] eyes out" for the two girls, although she could not say "where [or] when" this was and Buchko never told her the reason for his instructions. Vol. 5 p. 115. Bulas also testified that she was M.L.'s homeroom teacher and that typically information would be imparted to the homeroom teacher who would then pass it on to the remaining members of the team during their planning period. *Id.* at 110. Dawn Stephens and James Mayes, two other members of M.L.'s teaching team, also testified at trial, but there was no further corroboration of Buchko's claim. Vol. 2 pp. 106–22; Vol. 5 pp. 119–29. Despite the near-total lack of credibility of Principal Buchko's testimony,[10] the Court finds that Buchko did tell one member of

---

Court notes that whether Bulas told Buchko that M.L. had been returning from the bathroom crying and red-faced is central to the issue of notice on January 14, 2005 and hence to the success of Plaintiffs' claims. The Court also notes that Ms. Bulas has worked for the District for sixteen years, and appears far too young to be eligible for retirement. Vol. 5 p. 105.

In light of the evidence adduced at trial, the Court can understand both Ms. Bulas's discomfort and her limited powers of recall. As discussed *infra*, the District's treatment of the L. family after Dawn and Michael L. filed this lawsuit evinced a willingness on the part of the District to make life difficult for those who take a position adverse to the District's interests.

Officer Wagner's experience is also illustrative. She was a strong advocate for the L. family from her first involvement with M.L.'s case on February 3, 2005. Vol. 1 p. 30. That advocacy created considerable tension with the District and especially Principal Buchko. Indeed, this was "the beginning of the ruination" of what had previously been a "very good professional relationship" between Wag-

ner and Buchko, although "a couple other incidents" contributed to the deterioration of the relationship as well. *Id.* at 46–53, 70, 73–74. Officer Wagner was scheduled to return to the District as resource officer at the start of the 2005–2006 school year, but the District informed her chief on the day before the new term was to begin that there was no money available for a resource officer and that Wagner should therefore not report to the school. *Id.* at 72–73. She was assigned to the Detective Bureau four months later and the resource officer position reopened shortly thereafter. *Id.* at 73. Wagner has since "been stopped from entering the schools"; has had "administrators walk in and halt interviews with young children"; and has been "denied access to students in the school ... through the course of [her] job." *Id.* By contrast, Officer Wagner had "no problems" with the District prior to her involvement with the L. case. *Id.* at 73–74.

10. Principal Buchko's account of the foregoing events differed substantially from that of Dawn L. He denied that Dawn L. brought any notes with her to the meeting or that she

M.L.'s team of teachers to "keep an eye out," although he never told her why. The Court cannot, however, conclude that any other members of M.L.'s teaching team were similarly apprised, either by Buchko or Bulas.

Buchko did, however, admit to understanding that as of January 14, 2005, Dawn L. made "life decisions" for M.L. and that he was not free to override them; that Dawn L. found further contact between A.M. and M.L. unwelcome; and that regardless of any feelings of romantic or sexual attraction that M.L. might have for A.M., Dawn L.'s wishes trumped those of her daughter's and contact with A.M. was therefore, by definition, unwelcome. Vol. 4 pp. 64, 72. On this final point, that a student's parents determined what was and was not welcome conduct, Buchko was restating the District's sexual harassment

policy as articulated as well by both the superintendent and assistant superintendent. Vol. 2 pp. 174–77; Vol 5 pp. 53–54

Buchko subsequently spoke with the assistant superintendent at the time, Trudy Peterman, Ph.D., and told her that Dawn L. had complained to him about an older girl "bothering" M.L. Vol. 2 pp. 144–45. In response to Peterman's questions, Buchko agreed with her characterization of the notes as indicative of a boy and girl "dating situation." *Id.* at 145.

On the evening of January 14, 2005, Dawn L. spoke with M.L. again about what had happened between M.L. and A.M. Vol. 3 p. 5. M.L. began to "open[ ] up" and, although she "cried a lot," admitted that some level of inappropriate physical contact had occurred. *Id.* During the week of January 17, 2005, M.L. and A.M.

---

relayed to him what Paula B. had told her the previous night. Vol. 4 p. 66. The Parties have, however, stipulated to both assertions and, in fact, Plaintiffs' counsel confronted Buchko with the stipulations at trial. Joint Ex. 1 ¶¶ 10, 16, 18; Vol. 4 pp. 65–66. Buchko nonetheless persisted in his version of events. Vol. 4 pp. 65–66. He did, though, admit "hypothetically" that if the Parties' stipulations were true they "present[ed] a whole different picture" to him. *Id.* at 106.

The substantial discrepancy between Buchko's testimony and the Parties' stipulated facts would be more than sufficient ground for the Court to discount every bit of his testimony. Buchko's demeanor on the witness stand cast further doubt on his credibility, as did his purported records of events. For example, he claimed to have recorded the log entry at Ex. A regarding his meeting with Dawn L. "during [her] visit" on January 14, 2008. Vol. 5, p. 172. The log entry states, however, that Dawn L. would "try to come to understanding with other girls [sic] mom," even though the Parties have stipulated that prior to her meeting with Buchko Dawn L. informed Paula B. that "she didn't want A.M. to call the L's house or talk to M.L. at all," and that Dawn B. had told Buchko that she had already spoken with Paula B. Ex. A; Joint Ex. 1 ¶¶ 11, 18; Vol. 4 p. 78.

Buchko's *post hoc* chronology of events, allegedly prepared from his notes, phone logs, and memory, is likewise flawed. *See* Vol. 4 p. 90; Ex. 2. In his entry for January 14, 2005, he wrote that "[t]he girls would meet up to walk to school together even after Mr. and Mrs. [L.] scolded their daughter in hopes she would end any contact with [A.M.]" Ex. 2 p. 1. Since, however, Dawn and Michael L. had only discovered the notes on January 13, 2005 and, indeed, the Parties have stipulated that "[p]rior to January 13, 2005, Dawn L. and Michael L . . . . approved of the friendship," Joint Ex. 1 ¶ 4, and since Dawn L. had arranged to drive M.L. to school on January 14, the girls would have had no opportunity to "meet up" between the discovery of the first notes on January 13 and Buchko's meeting with Dawn L. on January 14.

As a further example of Buchko's lack of credibility, he testified that A.M. "was a very good student, an honors student." Vol. 74 p. 70. The illiteracy of A.M.'s letters suggests otherwise, and A.M.'s grades include a substantial number of Cs, Ds and Fs, scarcely the grades of an honors student. Ex. 9. Buchko also testified that he could not recall that A.M. had posed any previous discipline problems. Vol. 4 p. 74. Her eighth grade discipline log belies that claim as well. *See* Ex. 64.1.

nonetheless continued to meet at the middle school. Vol. 1 p. 133. M.L. told A.M. that her parents did not want them to have any further contact but A.M. said that she "was going to see [M.L.] anyway." *Id.*

On the morning of January 21, 2005, after M.L. had gone to school, her parents found another note, this one written on January 19, 2005.[11] Vol. 1 p. 134; Vol. 2 pp. 202, 216–18; Vol. 3 p. 177; Vol. 4 p. 44; Ex. 1. It read as follows:

sry 4 so sloppy 12 more days

Hey baby cakes, [picture of a face] how you doin? Me OK sence I wuz wit u yesterday afternoon. your so sexy. . . . I luv u so much mabey 2 much J/P. I buyin you 3 of thoose flower thing wats your H/R home room # ?. You know you liked [black rectangle] in the bathroom come today for step 2 OK. Be alone 4 real cuz just bealone OK. The real reason I didint whipout ! step 2 cuz I heard sombody in the hallways. how about ill be the Doctor & you be the patient. OK. its all up 2 ya, know but 4 real come alone. I got Tec–Ed 3rd pd & Science 7th pd. Bring Gum! is ms. urbas's class on your floor? cuz if so youll beable to see more if you like that.
 well
 G2G
ill ♥
miss
you
 *Lots of Love*

Ex. 1.

Dawn L. found this note upsetting, and after consulting with her husband called the West Hills police, the department within whose jurisdiction both the L. family and A.M. lived, because Dawn and Michael "needed to take some action to make sure M.L. was safe." Vol. 2 p. 221–22; Vol. 3 p. 178. They spoke with Chief Musulin; he asked if he could meet them at their house and Dawn and Michael agreed to an immediate interview. Vol. 2 p. 222.

Michael L. then left to pick up M.L. from the school. Dawn L. called the middle school to tell them to have M.L. waiting for her father in the office and spoke with Buchko. *Id.* at 223, 226; Vol. 3 p. 178; Vol. 480–81. The police arrived while Dawn was on the phone. Vol. 2 p. 226; Vol. 3 p. 179. Dawn told Buchko that she had found "more notes," and "that something happened in his building, and [she] felt like he [hadn't done] anything from the first time [she] was there."[12] Vol. 2 p. 226; Vol. 3 pp. 186–87; Vol. 4 p. 81. Dawn L. then told Buchko that she had to hang up to admit the police. Vol. 2 p. 226; Vol. 4 p. 81. Buchko never asked to see the notes. Vol. 4 p. 86. He said at trial he could not remember his reasons; in a prior deposition he had said that "he had no reason to ask for the notes." *Id.* at 87.

When Michael L. returned with M.L., she had another note from A.M. which was then retrieved from her bookbag. Vol. 1 pp. 147, 152; Vol. 3 pp. 7–8, 180; Vol. 4 p. 44. The note read as follows:

let me hit that sh* * I wanna f* * * it oh say 10 more days

Hey Baby Cakes,

 you can only use the basic cussin words nun of that c* * * sucker sh* *

---

11. The note says "12 more days" in the upper right hand corner. Ex. 1. This refers to M.L.'s birthday which, as previously noted, is January 31. Vol. 1 p. 134.

12. Buchko admitted at trial that he took the call, but denied that Dawn L. told him that something had happened at the middle school. Vol. 4 pp. 81, 84–85. Buchko's lack of credibility has been discussed at length in n. 10, *supra.* Moreover, District superintendent Barbara Parkins's record of Buchko's statements regarding the call at a meeting on February 7, 2005 corroborates Dawn L.'s testimony on this point. Ex. J.; Vol. 5 pp. 42–45.

lyke that only at night time when I be mackin you scream lyke that Why didnt you wait 4 me in the bathroom? cuz I wuz ready if u mean … …. can u b my "B.A.B.Y"?

I got to hit that [13] be4 the weekend cuz i wuz tryin to get u but u kept pushin me away az you usely do! why u alwayz do that ? I gotsta get somethin cuz I wont see you till Thursday! thatz along time. cuz I want that "p* * *y p* * *y poppin on a hand stand time [14] witcha. Oh id did it agian im that good to forfeel your fantasys *baby*

id like it 2 when you ways on top cuz i lyke it when u take control but not all the time cuz i lyke to leed when we buy r selves and do the wall thing [15] talkin about this stuff is starting to get old we need 2 make new

let me hit that today OK so I can do that 2 ya [arrow pointing to a picture of smiley face with a wet tongue hanging out].

i got Algebra 7th pd in 313 wat time do u want 2 met cuz my desk isnt buy the door?

> f***in love u
> f***in miss u
> f***in need u
> lots of love

Ex. 1.1; Joint Ex. 1 ¶ 8. The "10 more days" at the beginning of the letter refers

once again to M.L.'s birthday; the note was therefore written on January 21, 2005. Vol. 1 p. 106.

Chief Musulin attempted to question M.L. but she did not respond. Vol. 1 pp. 149–50. He left the notes with Dawn L. and told her to bring them and M.L. to the West Hills police station at 5:30 p.m. that day for a second interview. Vol. 73 p. 10. By this point he "felt that if he could get M.L. to talk they could pursue charges." Vol. 2 p. 224.

Dawn L. then called Barbara Parkins, the District's superintendent, but Parkins was "not available." Vol. 2 p. 227. Dawn L. was instead referred to Peterman, whose duties included supervision of the District's principals. *Id.* at 124–25, 227. Peterman told Dawn L. that Buchko had already spoken with her and she knew why Dawn was calling. Vol. 2 pp. 143–46, 227; Vol. 3 p. 180. The two women met that afternoon. Vol. 2 p. 228.

Dawn L.'s purpose in meeting with Peterman was to get "A.M. out of that [middle] school." Vol. 3 p. 11. She took with her the two notes she had discovered that day and gave them to Peterman. *Id.* at 12–13, 182; Vol. 4 pp. 44–45, 47; Ex. 1; Ex. 1.1. Dawn L. does not know if Peterman actually read the notes, but Peterman "had them in her hand." [16] Vol. 3 pp. 13, 182; Vol. 4 p. 47.

---

13. "Hit that" means to engage in a sexual act. Vol. 1 p. 58.

14. These are lyrics to a rap song. Vol. 1 p. 58.

15. The "wall thing," which took place at the middle school and at the girls' homes, involved M.L. leaning against a wall and A.M. "rub[bing] up against her, pressing up against her." Vol. 1 pp. 42, 146; Ex. 5 p. 4. "On top" refers to the same sort of activity, only conducted while lying down; this was not done at the school. Vol. 1 pp. 42–43; Ex. 5 p. 4.

16. Peterman testified that the first time she ever saw any of the notes was at her deposition in January of 2007. Vol. 2 pp. 156–59, 179–80. She claimed that Dawn L. had merely "mentioned the notes," but did not think that Dawn had gone "into a lot of detail." *Id.* at 164. After observing Dawn L.'s testimony over a period of several days, and after developing a strong sense of the outrage she was feeling by the time she discovered the second letter on January 21, 2005, it is inconceivable to the Court that she would not have attempted to show Peterman these most recent and most scurrilous letters from A.M. or that she would have simply "mentioned" the

Dawn L. told Peterman that Buchko had refused to do anything on January 14, 2005, and "now look what's happened." Vol. 3 pp. 13–14. Peterman responded that A.M. and M.L. "could be exploring their sexuality" and that "girl on girl" was new to Buchko. *Id.* at 14. At this point Dawn L. was "disgusted" and asked what it was going to take to protect M.L. and whether she had to "pull [M.L.] out of school." *Id.;* Vol. 4 p. 43. Peterman responded that "maybe [they] should just give M.L. a break," and suggested homebound instruction.[17] Vol. 3 p. 14.

Dawn L. decided that if accepting homebound instruction for M.L. was the only way she could keep M.L. safe she would "tak[e] it." *Id.;* Joint Ex. 1 ¶ 21. Peterman had her secretary bring the necessary papers and told Dawn L. that for M.L. to be eligible for homebound instruction she would have to claim a medical condition. Vol. 3 pp. 14, 185; Joint Ex. 1 ¶ 22. Dawn took the form to her family physician, Dr. Govzden, and explained what had hap-

pened to M.L. Vol. 3 pp. 184–85. The doctor agreed with Dawn that sexual assault was not a medical condition for purposes of the form and listed "social phobia, depression, selective mutism, and anxiety" as the grounds for her application for homebound instruction. *Id.;* Ex. G. Although Peterman advised Dawn that there was a ten-day waiting period for homebound instruction and M.L.'s homebound instruction actually started on February 10, 2005, M.L.'s last day at school before beginning homebound instruction was January 21, 2005. Vol. 2 p. 140; Joint Ex. 1 ¶¶ 24–25.

Peterman never met with Dawn L. again. Vol. 2 pp. 140, 148–49. She never spoke with Paula B., A.M., M.L. or any of M.L's or A.M.'s teachers about the "situation" between the two girls. Vol. 2 pp. 148–49. She also never directed anyone else in the District to investigate Dawn L.'s claims. *Id.* at 149.

Dawn L. took M.L. to speak with Chief Musulin on the evening of January 21,

notes without going into a great deal of detail about their contents.

Notably, when asked hypothetically whether, if the mother of a sixth grade girl came to the school with a complaint that an eighth-grade girl was writing sexually suggestive notes to her daughter; the daughter did not want sexual contact with the older girl; and the mother also did not want the girls to have sexual contact, Peterman agreed that the District would have been "obligated to commence an investigation into [the] mother's complaint." *Id.* at 162. She further agreed that such an investigation would encompass interviews of the girls involved, the girls' parents, and "other adults in the [school] building" in a position to observe the girls' behavior. *Id.* at 162–63. Peterman is presently the superintendent of another school district, Vol. 72 p. 123; her admission that she failed to investigate a complaint of sexual harassment under the circumstances and in the manner described above would scarcely enhance her career prospects.

**17.** Buchko testified that during Dawn L.'s call to him on January 21, 2005 she told him that

she had already spoken with Peterman and "they want[ed] [M.L.] on homebound." Vol. 4 p. 81. He also testified that Dawn told him "the police were at the door." *Id.* Apart from the general issues of credibility that surround Buchko's testimony, his timeline for this claim makes no sense. If M.L.'s parents were attempting to solve their problems via the police, presumably by seeking A.M.'s arrest, they had no reason to remove M.L. from school before determining whether the criminal justice system might remove A.M. instead. Moreover, Peterman's testimony does not support Buchko's claim; she could not "even remember who had suggested homebound...." Vol. 2 pp. 143–44. The sequence of events related by Dawn L. is more logical and therefore the one the Court will credit. To the extent that Buchko's phone log at Ex. B suggests otherwise, the Court notes that the original is in evidence and consists merely of a single unbound sheet with a printed grid that could have been filled in at any time before its submission to the Court.

2005. Vol. 73 p. 19. The chief was unable to obtain any information from M.L., but told Dawn L. that M.L. "seemed traumatized." *Id.* He also advised Dawn L. that if M.L. discussed the situation with A.M. with her therapist "he would be able to use that for charges...."[18] *Id.* at 19–20.

On January 26, 2005, M.L.'s parents found a note from M.L. to A.M. which said in part: "I dont [sic] know what I would do if I wasnt [sic] allowed to see you again. I'd kill myself."[19] Ex. CC–10a (incorrectly identified by counsel in the transcript as CC–1); Joint Ex. 1 ¶ 27; Vol. 3 pp. 36–37, 192–93. Dawn and Michael L. "immediately grabbed M.L. and took her down to [the emergency room at] Conemaugh [Hospital]." Vol. 4 pp. 155–56; Vol. 1 p. 160; Vol. 3 pp. 36–37; Joint Ex. 1 ¶ 27. Dr. Barra, a physician at the hospital, talked to M.L. and "felt that the threat was serious...." Document No. 73 pp. 37–38; Vol. 4 p. 156. Conemaugh Hospital had no room available in its psychiatric ward and the only alternative Dr. Barra could recommend was a facility "out past Altoona...." Vol. 3 p. 38; Vol. 4 p. 156. That institution did not, however, permit parental contact for at least ten days after admission, and "when they said that [M.L.'s] eyes looked like, it was just too

much—[Michael L.] knew M.L. couldn't handle that." Vol. 74 p. 156.

M.L.'s parents brought her home under a "suicide watch." Vol. 4 p. 157. They hid all the sharp objects in their home including knives and scissors. Vol. 3 p. 39; Vol. 4 p. 157. M.L. was never left alone; either one of her parents or one of her siblings was her "tag-along partner for a while." Vol. 4 p. 157. She was required to bathe with the door open, and one of her parents would stay upstairs while she was in the tub. Vol. 3 p. 39. M.L. slept with her parents in their bed the first night they brought her home; subsequently at least one of her parents slept in her room.[20] Vol. 3 p. 39; Vol. 4. p. 157.

On February 2, 2005, although M.L. was no longer in school, she accompanied her family to watch N.L. play basketball. Joint Ex. 1 ¶ 26. The family had been warned by another student that A.M. and a friend "were planning on coming to N.L.'s game to get at M.L." Vol. 3 p. 48. A.M. and the other girl did attend the game, "positioned themselves perfectly" in M.L.'s line of sight, and proceeded to stare at M.L. "the entire game." *Id.* at 50; Vol. 4 p. 165.

Dawn L. called 911 from her cell phone, informed the operator that the West Hills

---

**18.** Ultimately, as discussed below, it was the Johnstown and not the West Hills police department that filed charges against A.M. Joint Ex. 1 ¶ 39; Vol. 3 p. 185; Ex. 5 p. 12.

**19.** Plaintiffs established that M.L. never gave the note to A.M. Vol. 2 pp. 32, 101 (with counsel again mis-identifying the note as Ex. CC–1); Vol. 3 p. 42 (also referring erroneously to Ex. CC–1). Dawn L. testified that one of M.L.'s therapists told M.L. to write notes to A.M. as part of M.L.'s therapy. Vol. 3 pp. 40–42. The Court understood that these letters were written for their therapeutic value only and not for delivery. At trial M.L. could not remember the subject matter of her therapists' writing assignments, but did not think that writing letters to A.M. was part of her

treatment. Vol. 72 pp. 34–35. In light, however, of the generally unresponsive nature of M.L.'s testimony, *id.* at 24–25, and the general clarity and consistency of Dawn L.'s testimony the Court finds that M.L. did write the note as part of her therapy.

The notes M.L. wrote to A.M. during the course of her treatment often display affection for A.M. *See* Ex. CC–10a; CC–20a. This is unremarkable; many victims of abuse "express affection" for their abusers. Vol. 1 p. 104.

**20.** There was no evidence adduced at trial regarding the duration of the suicide watch, but M.L. was not in therapy at the time of the trial. Vol. 3 p. 21.

police were conducting an investigation, and asked to make a report. Vol. 3 p. 50. The operator referred Dawn L. to Officer Frombaugh, the City of Johnstown officer who was stationed at the gym. *Id.* Dawn spoke with Frombaugh, who then spoke with A.M. *Id.* at 51. Since there had been no physical contact Frombaugh "really couldn't do anything," but at the end of the game he did place himself between A.M. and the L. family as the family exited the gymnasium. *Id.*; Vol. 4 p. 165. He also told Dawn and Michael L. "that [they] needed to go see Julie Wagner the next day" at the middle school. Vol. 3 p. 51.

Dawn L. met with Officer Wagner on February 3, 2005 and told her what had happened the previous night as well as about her original meeting with Buchko, "and just everything that happened start to finish." *Id.* at 52; Vol. 1 pp. 30–31; Ex. 5; Joint Ex. 1 ¶ 28. Dawn L.'s account included statements that she had provided both Buchko and Peterman "with notes written back and forth between the girls" and that both administrators had told her "that the incidents appeared to be consensual and that there were no sanctions they could impose on [A.M.]." Ex. 5 p. 2.

Officer Wagner arranged to interview M.L. that morning. Vol. 1 p. 32; Vol. 3 p. 52; Ex. 5 p. 3.; Joint Ex. 1 ¶ 29. Officer Wagner testified that "[d]isclosure is not a one-time event," but rather "a process, and it's an ongoing process that can take weeks, it can take years." Vol. 1 p. 34. She was nonetheless able to get M.L. to open up on the morning of February 3, 2005. Much of that first interview was devoted to a discussion of the contents of

the notes in evidence as Exhibits 1 and 1.1, during which Officer Wagner determined that the notes did in fact mention sexual activities and that the bathroom to which Exhibit 1 referred was in the middle school. Vol. 1 pp. 42–43; Ex 5 pp. 3–5; Joint Ex. 1 ¶ 30. The Parties have stipulated that at this or a subsequent interview M.L. was "fearful, for some reason of A.M. and [Wagner did not] know why ... [M.L.] seemed fearful of the repercussions if she said anything. She seemed sad. She seemed embarrassed. She cried an awful lot." Joint Ex. 1 ¶ 30. The Parties have also stipulated that "M.L. told Wagner that A.M. 'would touch her in ways that weren't very comfortable." *Id.* At the close of the interview Dawn L. granted Officer Wagner permission to conduct a second interview with M.L. on February 8, 2005. Vol. 1 p. 46. Officer Wagner then attempted to contact A.M.'s mother, with no success. Ex. 5 p. 9.[21]

On February 4, 2008, Officer Wagner "was on military duty at the reserve center on Goucher Street," but tried to telephone Buchko to "touch base" and "let him know what was happening." Vol. 1 p. 46. He refused her call and Buchko's secretary told Officer Wagner that Buchko would see her "in the superintendent's office with her chief on Monday [February 7, 2005] at one o'clock." *Id.* at 46, 48.

The meeting on February 7, 2005, which included Parkins, Buchko, Officer Wagner and a police supervisor[22] was not for the purpose of dealing with the L. family's concerns but was instead held to address Buchko's claim that Officer Wagner had

---

21. Officer Wagner tried to contact Paula B. on February 3, 4, 7, 8, 10, 11, and 15, 2005; March 11, 2005; and April 5, 2005. She was finally successful on her second attempt on April 5. Ex. 5 p. 9.

22. Parkins's testimony and her notes from the meeting indicate that the supervisor was

Chief Foust, Vol. 5 p. 42; Ex. J, while Officer Wagner's testimony and her report indicate that it was Captain Frear. Vol. 1 pp. 49–50; Ex. 5. For purposes of the instant case, it is not necessary for the Court to make a finding regarding the identity of the police supervisor at the meeting.

accused him, in her initial meeting with Dawn L., of covering up the sexual assault of M.L. by A.M. Vol. 1 pp. 49–50; Vol. 4 p. 82; Vol. 5 p. 43; Ex. 2 p. 2; Ex. 5 p. 5; Joint Ex. 1 ¶ 31. Parkins did not know beforehand that the meeting involved the L. family. Vol. 5 p. 43. As Parkins testified, "the essence of the meeting was that, you know, they were, there was friction between the Johnstown Police Department and the school district and we were trying to iron it out. So [Parkins's] notes on the incident, the L. incident itself, [were] probably pretty sketchy." *Id.* at 44. Officer Wagner had not, however, made any allegation of coverup; the difficulty arose from the misapprehension of one of Buchko's secretaries. Vol. 1 pp. 49–50; Ex. 5 p. 5.

During the meeting Buchko stated that the reason he had not contacted Officer Wagner regarding Dawn L.'s concerns was that Dawn L. wanted "the issue regarding her daughter kept confidential...."[23] Ex. 5 p. 5. Either Parkins or Buchko suggested that the activities of M.L. and A.M. were "consensual"; that therefore "school personnel did not feel the need to take further action"; and that "to pursue [the] matter would appear to be conducting a 'witch hunt' for lesbians...." Ex. 5 p. 5; Vol. 1 pp. 51–52; Vol. 75 p. 47; Ex. J. p. 1. Officer Wagner "shared with Mr. Buchko the notes which A.M. had written which were highly suggestive of sexual encounters in the school bathroom," Joint Ex. 1 ¶ 32, and her supervisor informed Parkins

and Buchko "that a criminal act may have occurred on school property and a police investigation should have been done." Ex. 5 p. 5; Vol. 1 pp. 50–52. The meeting ended with an agreement "[t]hat there would be more cooperation between the police department and school administration" regarding the sharing of information in this matter. Vol. 1 pp. 52–53; Ex. 5. p. 5. Parkins had no further involvement with the case until April of 2005. Vol. 5 pp. 50–51.

Officer Wagner interviewed M.L. again on February 8, 2005.[24] Joint Ex. 1 ¶ 29. M.L. "didn't want to talk about what happened in the school bathroom" and started "shaking" and "crying" when asked. Vol. 1 p. 54. M.L. did, however, tell Officer Wagner that she used to tell A.M. to stop when A.M. wanted to do the "wall thing," but then "just 'gave up' and let it happen." Ex. 5 p. 6; Vol. 1 pp. 53–55. On February 9, 2005, Officer Wagner interviewed other students at the middle school and determined that "it was very common knowledge" among A.M.'s friends "that there were meetings" between A.M. and M.L. in the school bathroom. Vol. 1 p. 60.

On February 10, 2005, nearly four weeks after Dawn L. first notified him of the unwanted contacts between A.M. and M.L., Buchko conducted his first interview with A.M. Vol. 1 p. 60; Joint Ex. 1 ¶ 33. Officer Wagner was present but because she had been unable to speak with Paula B. to obtain permission to question A.M. she asked no questions herself. Vol. 1 pp. 60–61; Ex. 5 pp. 8–9. Buchko had Exhibits 1 and 1.1 in front of him[25] and ques-

---

**23.** By contrast, Buchko testified at trial that the reason he had not discussed the matter with Officer Wagner was because he knew that the L. family had already contacted the police—although he "was not aware of it being the West Hills police"—and assumed that anything pertinent would be reported to Officer Wagner. Vol. 4 pp. 85–86; Ex. 2 p. 2. After observing the testimony and demeanor of both Officer Wagner and Principal Buchko, the Court finds Officer Wagner's testimony to be highly credible and, as discussed above,

Principal Buchko's testimony to warrant minimal credence at best.

**24.** Officer Wagner also met with M.L. on February 14, 2005, but it was "a short visit" intended merely to maintain "established rapport" and "[n]o new information was discussed." Ex. 5 p. 7; Joint Ex. 1 ¶ 29.

**25.** That Buchko referred to the notes, which were found by Dawn and Michael L. outside the school, belies Buchko's notation in his

tioned A.M. about their contents, including the phrase "ill [sic] be the doctor and you be the patient" and the discussion of "hitting it." Vol. 1 p. 61; Ex. 5 p. 8. A.M. responded that "that's just how [she and M.L.] talk[ed]"; that M.L. wrote notes to A.M. as well; and that the real culprit was Dawn L., who was "jealous" that M.L. loved A.M. more than Dawn. Vol. 1 pp. 61–62; Ex. 5 p. 8.

Buchko told A.M. that it looked like she was engaged in prohibited behavior in the girls' room at the middle school; that her sexual preferences were her business, but "these types of notes and behavior [did] not belong in school"; and that she was to stay away from M.L. at any District activities or functions. Ex. 5 pp. 8–9; Vol. 1 p. 96; Vol. 4 pp. 101–02. Officer Wagner told M.L. to have "absolutely no contact" with M.L, including exchanges via computer, notes, or "messages through mutual friends. . . ." Ex. 5. p. 9.

By this time Officer Wagner "felt she had enough evidence to warrant the filing of criminal charges against A.M." [26] Joint Ex. 1 ¶ 34. Buchko was less concerned, merely "beginning to take the first step in issuing [A.M.] a warning." Vol. 4 p. 102. He did not think A.M.'s conduct to date warranted stronger sanctions since "this [was] the first time that [he was] seeing any kind of vulgarity in any type of note." *Id.* The middle school's assistant principal, Mr. Frontino, had yet another view of the situation. He found it entertaining, commenting at one point "as a joke": "[O]h,

lesbian activity in the bathroom and I missed it." [27] Vol. 1 pp. 71–72.

Notwithstanding Buchko's and Officer Wagner's warnings to A.M. to have no further contact with M.L., on February 13, 2005 A.M. attempted to send M.L. three carnations she purchased at school for Valentine's Day. Vol. 73 pp. 58–60; Ex. 5 p. 8; Ex. 1.8. The flowers were not delivered; they were kept at the main office of the middle school and Officer Wagner retained the attached cards. Ex. 5 p. 8. A.M. was not punished for this violation of Buchko's instructions. Ex. 64.1. On February 16, 2005 A.M. also attempted to approach M.L., who was in the L. family's yard at the time. Ex. 5 p. 10. A.M. did not, however, enter the L.'s property or have any contact with M.L. *Id.*

February 10, 2005 was not only the date of Buchko's first warning to A.M.; it was also the date on which M.L.'s homebound instruction was to begin. Ex. 2 p. 2; Ex. 36. While in school, M.L. had received approximately 20 hours of tutoring per week. Vol. 2 p. 131. Recipients of homebound instruction, who were generally confined to their homes due to illness, were to receive only five hours per week on the "theory that a student is on homebound because they can't handle six hours a day, five days a week." *Id.* at 128, 177. M.L. was, however, capable of handling a full course load; she had been placed on homebound for the sole purpose of keeping her away from A.M.

chronology at Ex. 2 p. 1 that he had been instructed by Peterman to ignore any notes found outside the school.

**26.** The record is not clear regarding Officer Wagner's reasons for not filing charges until April of 2005. Her rationale is not, however, relevant to the instant proceeding. The District has admitted that the presence of criminal conduct does not absolve the District of its own obligations regarding student-on-student

sexual harassment and it is the alleged failure of the District to fulfill those obligations that is the subject of the sexual harassment portion of the instant case. Vol. 5 pp. 53–54.

**27.** Officer Wagner could not recall when Frontino made his remarks, but it was "certainly . . . after the knowledge of the [assault in the middle school bathroom on January 18, 2005] came about. . . ." Vol. 1 pp. 70–72.

A homebound instructor is supposed to pick up where the student left off in class. *Id.* at 132. In M.L.'s case, her homebound teacher was told to see M.L.'s guidance counselor for M.L.'s curriculum. Ex. 36. Dawn L. was particularly concerned that the instructor would adhere to M.L.'s GIEP. Vol. 3 p. 17.

Dawn L.'s concerns were not misplaced. The homebound instructor, Raymond Zonin, came late and left early for his sessions with M.L. *Id.* at 25. When he did show up, he appeared more interested in chatting with Michael L. or M.L.'s siblings than with actually teaching M.L. *Id.* at 24; Vol. 4 p. 160. Eventually, Michael L. had to absent himself from the room as soon as Zonin arrived and on at least one occasion Michael L. had to tape a piece of plastic over a doorway to isolate himself and his wife from Zonin. Vol. 4 p. 161. In an attempt to minimize distractions both to Zonin and their other children the family ultimately had Zonin meet M.L. at Dawn L.'s mother's house. Vol. 3 p. 24. On average, Zonin spent less than two hours per week actually teaching M.L. Vol. 1 p. 163; Vol. 3 p. 32.

The quality of whatever instruction did occur was poor. Zonin had none of the texts M.L. had used in school and the only text that Dawn L. had been able to obtain from the District was M.L.'s math book. Vol 3 pp. 26–27. Over the objection of M.L.'s parents and M.L. herself, and even though by February of 2005 M.L. had covered roughly half of the year's material, Zonin insisted on starting from the beginning of the year in her math course. Vol. 1 pp. 164–65; Vol. 3 p. 28. Word search puzzles, which M.L.'s regular language arts teacher indicated might at best be something she would use for extra credit, comprised the principal part of Zonin's English lessons. Vol. 3 p. 27; Vol. 5 pp. 115–16. Zonin gave M.L. spelling words which were in some cases the same as those her brother, who was three years younger than M.L., was assigned in class. Vol. 4 p. 162. Zonin also had M.L. watch a video on bullying and may have tested her on it. Vol. 3 p. 27. M.L. "thought he was an idiot." *Id.* at 34. Her siblings concurred in that assessment. *Id.*

M.L.'s GIEP required enrichment activities in every subject; Dawn L. did not believe that Zonin was providing even basic instruction. *Id.* at 31; Ex. 10. p. 21. Peterman was the "homebound coordinator" and Dawn L. tried "two or three times" to speak with her to register her displeasure with Zonin's performance. Vol. 3 pp. 33–34; Vol 2 p. 124. Peterman, however, was never "available." Vol. 3 p. 33.

M.L.'s parents were convinced that she was "completely being deprived of an education." Vol. 3 p. 62. M.L. did not like being on homebound instruction and missed her friends; at some point she asked her father why she was being "punished." Vol. 1 p. 167; Vol. 3 p. 62; Vol. 4 p. 166. In addition, Dawn and Michael L. did not allow M.L. to engage in any activities unless she was with one of them. Vol. 3 p. 61. Moreover, her fellow students were speculating on possible reasons for her continued absence from school, and M.L. was not willing to tell them the real reason. Vol. 3. p. 62; Vol. 4 p. 167–68. For all these reasons, M.L. was "locking down" and "actually going back inside a shell that was probably worse than [Michael L.] had ever seen. . . ." Vol. 5 p. 19.

Dawn and Michael L. began to consider allowing M.L. to return to the middle school. Vol. 3 pp. 35–36, 61–62. They first spoke with M.L.'s therapists, who advised them that "if [M.L.] felt ready then it would be okay for her to be there." Vol. 3 p. 62. They also spoke with Officer Wagner, whom they "knew and trusted," and whom they felt would protect M.L. if she

did return to the middle school.[28] Vol. 73 p. 63; Vol. 5 p. 20. Dawn L. then called Peterman to inform her that M.L. would no longer require homebound instruction; that the instruction had not been satisfactory; and that Dawn L. "needed to meet with all M.L.'s teachers" to "set up" a plan to ensure M.L.'s safety upon her return to the middle school. Vol. 3 pp. 64–65, 189–90.

On March 11, 2005 Dawn L., Officer Wagner, and the six teachers in M.L.'s teaching team met to discuss M.L.'s return. Joint Ex. 1 ¶ 36. Buchko was not in attendance. *Id.* Dawn L. told the teachers the reason for M.L.'s absence; "[t]hey seemed pretty shocked." Vol. 3 pp. 65, 205. The teachers "said they wondered why M.L. had been pulled out, and they said anything they could do they would."[29] Vol. 3 p. 65; Ex. 5 p. 9.

Dawn L. "asked the teachers to keep an eye out for M.L. and told them that A.M. should have no contact with M.L." Joint Ex. 1 ¶ 37. Dawn L., the teachers, and Officer Wagner agreed that Dawn L. would drive M.L. to school late and pick her up early; that M.L. would have a specific bathroom to use which was outside the in-school detention room and which the aide assigned to the room could monitor;

and that if M.L. needed to use the bathroom her teacher would notify the aide that M.L. was coming and the aide would notify the teacher when M.L. left the bathroom to return to class. Vol. 1 p. 169; Vol. 2 p. 121; Vol. 3 pp. 66, 207–08; Vol. 5 p. 111. They also arranged to move M.L.'s locker "so [A.M.] wouldn't know where M.L. would be between classes." Vol. 3 p. 66.

M.L.'s parents were satisfied that under the procedures listed above being in school would be better for M.L. than remaining on homebound instruction and on March 15, 2005 M.L. returned to the middle school. *Id.* at 190; Joint Ex. 1 ¶ 35. She and A.M. did not meet in the bathroom again and, in fact, their last physical contact took place on January 18, 2005. Vol. 2 pp. 28–29. On "at least two occasions," though, Dawn Stephens observed A.M. in one of the stairwells as Ms. Stephens was moving her class, including M.L., downstairs to the gymnasium. Vol. 2 pp. 115–16; Vol. 3 p. 67. When she noticed A.M. Ms. Stephens changed her route to avoid the girl and notified Buchko. Vol. 2 p. 116, 119; Vol. 3 p. 67. Ms. Stephens and Ms. Bulas also "observed A.M. on the 6th grade floor at least four times" during the last week of March and the first week of April, 2005.[30] Vol. 1 p. 65; Ex. 5 p. 10. In

---

**28.** Officer Wagner explained to Dawn and Michael that she would be away from the school for several weeks on active military duty, and that during her absence they could contact her substitute, Officer Westrick, if they had any problems. Ex. 5 pp. 9–10; Vol. 1 p. 65 (stating that Officer Wagner was in South Korea "from the middle of March until the first week of April").

**29.** Dawn Stephens, one of the teachers, did testify that Buchko had told the team why M.L. had been out of school "a week or so before [M.L.] came back." Vol. 2 p. 112. Her recollections were, however, so vague, notably imputing Buchko's presence at the March 11 meeting while the Parties have stipulated that he was not there, *see* Vol. 2 pp. 111–15; Joint Ex. 1 ¶ 36, that the Court finds

her to be less credible than Dawn L. on this point.

**30.** Stephens initially testified that she could not recall observing A.M. on the sixth grade floor, Vol. 2 p. 115, then that she "never saw A.M. on [her] floor." *Id.* at 120. Officer Wagner's report, however, which recounts non-hearsay statements by Stephens, *see* Fed. R.Evid. 801(d)(2)(D), was drafted contemporaneously with the statements in question and not, as in Stephens's testimony at trial, over three years later. Moreover, as discussed in n. 9, *supra*, employees of the District had strong incentives to not remember incidents that could be damaging to their employer. The Court also notes that Officer Wagner requested that both Bulas and Stephens provide

the last of those incidents, Ms. Stephens "intentionally held her class for five minutes after the bell rang to ensure the halls were clear," but "[w]hen she walked out, there was [A.M.]"[31] Ex. 5 p. 10; Vol. 5 p. 63. Eighth graders did take classes in both art and possibly home economics on the sixth grade floor. Vol. 1 p. 66; Vol. 5 p. 121. A.M. was not, however, taking either of those subjects, Ex. 9 p. 36; she had "no legitimate reason" to be on the floor. Ex. 5 p. 10; Vol. 1 p. 65–66.

On March 23, 2005, eight days after M.L.'s return to the middle school, Stephens recovered a note which A.M. had passed to M.L. through a mutual friend. Vol. 1 pp. 169–71; Vol. 72 pp. 117–18; Ex. CC–6a; Ex. 1.10; Ex. 1.11; Joint Ex. 1 ¶ 38. It read as follows:

Why am i so diffrent?
What did i ever do
to deserve the kind of treatment
that i receive from you.
When times were blue.
You stood by mi side
through and through
But now you have changed.
you are acting quite diffrent
I want your old self,
to come out from inside
I want our friendship back
I want you to change
Is it asking too muck
for you to be mi friend once again?
you don't care about me lyke i do 4 you.
inskool is the only time i see you 4 the
rest of the time im hear so thanx [frown-

ing face] for everything you didnt do
pluse you cheated on me
So much 4 1:00
G2G
supose to be a lot of love.
Bye

Ex. CC–6a. Buchko wrote the name of the child from whom the note had been taken;[32] that it was directed toward M.L.; and "3/23/05," its date of confiscation, in the upper left hand corner of the note. Vol. 4 p. 103; *see also* Ex. A and B (providing examples of Buchko's handwriting).

Officer Wagner's first back at the middle school after her return from South Korea was on or about April 5, 2005. Vol. 5 p. 62. Upon her return she learned of the incidents described above and proceeded to "search out the note" A.M. had transmitted to M.L. *Id.* at 63–64; Ex. 5 p. 10. She cannot recall who showed it to her, but it was "one of the administrators." Vol. 5 p. 64. In light of this evidence, Stephens's testimony that she had turned the note over to either Buchko or Officer Wagner, Vol. 2 p 118, and the fact that Officer Wagner was out of the country on March 23, 2005, Vol. 1 p. 65, the Court finds that Buchko knew of this note on or shortly after March 23, 2005.[33]

Officer Wagner informed Buchko that she was preparing to file charges against A.M. and asked him if there was any action he could take under the District's discipline code. Vol. 5 p. 64; Ex. 5 p. 11. He spoke with Parkins and determined that a 10–day suspension was appropriate.[34] Ex. 5 p. 11; Vol. 4 p. 105. At this

her with written statements and that neither did so. Vol. 1 pp. 90–91.

**31.** Buchko testified that he had been unaware of this encounter. Vol. 5 p. 183. When informed at trial by Plaintiffs' counsel that Stephens had held her class for five minutes, he responded, "that's very proactive on her part." *Id.*

**32.** M.L. read the note, then allowed another student, T.P., to read it as well. Vol. 1 p. 171. Stephens confiscated the note from T.P. *Id.*

**33.** Buchko testified that the first time he saw the note was when Officer Wagner brought it to him on April 4, 2005. Vol. 4 pp. 103–04; Vol. 5 pp. 177, 182–84. The Court finds this to be no more credible than the rest of Buchko's assertions.

**34.** Although district policy required that a

point the District viewed the passing of the note as a "Level 4" violation, the most severe, akin to a weapons or drug violation. Vol. 4 pp. 102–03; Ex. 64.1; Ex. N. After a second meeting with Buchko in which he informed Officer Wagner of the decision to suspend A.M., Officer Wagner escorted A.M. from the in-school detention room to which she had been assigned for an unrelated infraction to a conference room in which Buchko and Frontino were also present.[35] Vol. 5 p. 64; Ex. 5 p. 11; Ex. 64.1. There Buchko detailed his reasons for suspending A.M.[36] Ex. 5 p. 11. During the ensuing discussion, A.M. admitted that she was obsessed with M.L. Id.; Vol. 1 pp. 62–63.

Officer Wagner then told A.M. that Wagner would be filing charges against her. Vol. 5 p. 64. Since A.M. was being suspended Officer Wagner did not, however, take her into custody. Id. A.M. subsequently telephoned her mother from the school and Officer Wagner had her first opportunity to speak with Paula B. Ex. 5 p. 11. Buchko issued the notice of suspen-sion on April 6, 2005; the out-of-school suspension began the following day.[37] Ex. N. Officer Wagner filed four criminal charges on April 7, 2005,[38] consisting of two counts of stalking, a first degree misdemeanor; one count of indecent assault, a second degree misdemeanor; and one count of harassment, a third degree misdemeanor. Ex. 6; Joint Ex. 1 ¶ 39.

The District's ten-day suspension of A.M. was the maximum penalty it could impose without conducting a formal hearing. 22 Pa.Code § 12.6(b)(1); Vol. 5 pp. 178–79. The "next step" in the disciplinary process, expulsion, would have required a formal hearing before the District's board of directors. 22 Pa.Code § 12.6(b)(2); Vol. 5 p. 179. Expulsion would not, however, have terminated the District's obligation to educate A.M., and if she had not been able to find another school in which to enroll the District would have been required to provide her with homebound instruction. 22 Pa.Code § 12.6(e); Vol. 5 p. 179. On April 14, 2005 the District and Paula B. therefore signed

principal furnish Parkins with an incident report upon his receipt of a complaint of sexual harassment, Parkins had received no incident report and indeed no information about this matter since the meeting on February 10, 2005. Vol. 5 pp. 41, 50–51. Indeed, Parkins never received an incident report in this case, although she testified that the April 14, 2005 stipulation and agreement discussed below "suffice[d] as an incident report at that point to [her]." Id. at 51.

35. It is unclear from the record whether this meeting took place on April 5 or 6, 2005. Officer Wagner's report indicates that the date was April 5, Ex. 5 pp. 11–12; the District's records suggest that it was April 6. Ex. 64.1; Ex. N. For the purposes of the instant action it is not necessary for the Court to determine the precise date and the Court therefore declines to do so.

36. At trial Buchko sought to explain his dilatory response to A.M.'s passing the note by reference to the District's Easter break. Vol. 5 p. 184. Defendant did not, however, supply the Court with the District's break schedule. Pursuant to Fed.R.Evid. 201(c) the Court takes judicial notice of the fact that in 2005 Easter Sunday was March 27. Without knowing the exact dates of the District's 2005 Easter recess the Court cannot, however, determine that Buchko's first opportunity to respond to a Level 4 offense that occurred on the Wednesday before Easter was the Tuesday nine days after Easter. Based on the evidence available to it, the Court finds that it is more likely than not that Buchko could in fact have responded to the note at an earlier date.

37. This suggests that the Parties' stipulation that the last day M.L. and A.M. were in school together was April 4, 2005, Joint Ex. 1 ¶ 40, is incorrect and that the actual last day was April 6, 2007.

38. The Parties' stipulated date of April 4, 2005 is incorrect. Compare Joint Ex. 1 ¶ 39 with Ex. 6 p. 1.

a stipulation and agreement in lieu of expulsion which excluded A.M. from the middle school and placed her in the District's alternative education program, which was conducted at the high school. Vol. 5 pp. 179–80; Ex. O; Joint Ex. 1 ¶ 42.

Dawn L. and M.L. were prepared to testify against A.M. in the criminal proceeding, Vol. 3 pp. 46–47, 70, but on May 16, 2005, A.M. and Paula B. signed a consent decree admitting to the charges proffered by Officer Wagner and accepting a six-month period of probation with certain conditions. Vol. 1 pp. 67–68; p. 70; Ex. 18. One of those conditions was that A.M. was to "have no direct or indirect contact" with M.L. or her family. Ex. 18 p. 1. A.M., however, "continued throughout the end of May to stalk and harass [M.L.], and [Officer Wagner] had to have the juvenile probation officer notified for a reinstatement of the charges." [39] Vol. 1 p. 68; Vol. 3 p. 78; Joint Ex. 1 ¶ 40. After a hearing, the Court of Common Pleas of Cambria County, Juvenile Division, ordered on June 13, 2005 that A.M. "remain on the consent decree for 12 months" from the date of the order. Ex. 17; Vol. 1 p. 69.

Buchko testified that when M.L. returned to school he "had staff reports that she was doing a lot better." Vol. 5 p. 183. Similarly, Mayes testified that he telephoned M.L.'s parents after her return to inform them that "she was much more outgoing ... and she participated much more in class. . . ." *Id.* at 120. The Court finds that both these statements are consistent with M.L.'s knowledge that her parents, teachers and the school resource officer were aware of her problems with A.M. and had crafted a program to prevent her from suffering further sexual assault, and that A.M. had been suspended and subsequently removed from the middle school at the beginning of April, 2005. Joint Ex. 1 ¶¶ 40–41.

While M.L. may have felt better after her return she did suffer academically for her absence.[40] It is difficult to determine the degree of injury, since M.L.'s teachers "didn't know what to do with [her] grades from homebound. . . ." Vol. 3 p. 191; Ex. 10 p. 79 (omitting a grade for pre-algebra from the third quarter of M.L.'s sixth grade report card). Indeed, M.L.'s school records contain no "progress reports or anything" from Zonin. Vol. 2 p 138; Ex. 10. M.L. "definitely had difficulties" with math upon her return, and she and her mother "worked very hard" to catch up. *Id.* In addition, for all Mr. Mayes's pleasure in M.L.'s purported change of demeanor, he gave her a C in science the last quarter; he had previously given her Bs. Ex. 10 p. 93.

M.L.'s final grades for sixth grade nonetheless qualified her for membership in the National Junior Honor Society.[41] Vol. 5 p. 112. She did not, however, receive a letter to that effect; she was the only one of the approximately 25 students in her gifted and talented class who did not. Vol. 3 p.

---

**39.** The Court cannot determine from the evidence before it whether the additional contact which prompted Officer Wagner to seek reinstatement of the charges occurred while A.M. was under the District's supervision.

**40.** This post-return decline was in addition to the general drop-off in grades M.L. had experienced since starting sixth grade. During fifth grade, with the exception of a C in the third quarter for social studies, M.L. received nothing but As as quarterly grades. Ex. 10. p.

94. By contrast, in the first two quarters of sixth grade M.L. received Bs in two quarters of mathematics, the second quarter of reading, two quarters of science and the second quarter of social studies. *Id.* at 93. Her other grades for those quarters were all As. *Id.*

**41.** Dawn L. erroneously omitted the word "Junior" from her description. Vol. 3 pp. 133–38.

133. Dawn L. spoke with Buchko about this and "he said he would get back to [her]." *Id.* at 135. When he did, Buchko told Dawn L. that "it could have been an oversight, he wasn't sure, but [M.L.] would be included." *Id.* at 135–36.

Several years later this "oversight" occurred again when Dawn and Michael L.'s youngest child, B.L., did not receive his notification letter.[42] *Id.* at 136–37; Vol. 4 p. 22. Unlike his sister, B.L. did not tell his parents that he had not received the letter until the day of the induction ceremony and on three different days had remained in his classroom with one other student while the rest of his class practiced for the ceremony. Vol. 3 pp. 136–38; Vol. 4 pp. 20–22. The L. family did not attend the ceremony, at which B.L.'s name was called. *Id.* The next day Dawn L. called the middle school; the person with whom she spoke said, "oh Dawn, I don't know what could have happened, but I have all of B.L.'s [National Junior Honor Society] things in the office." *Id.* at 138. Ms. Bulas, who was also B.L.'s homeroom teacher, passed out certificates of membership sometime after the ceremony; B.L.'s was included.[43] Vol. 5 pp. 114.

Superintendent Parkins met with Dawn L. for the first time regarding M.L. and A.M. near the end of May, 2005. Vol. 3 pp. 75–76. School was still in session and there were open gym sessions in preparation for the summer basketball league. Vol. 5 p. 137. Tony Penna, Sr., the District's athletic director, and Buchko were present at the meeting as well. Vol. 3 pp. 76; Vol. 5 pp. 74, 80–81. Tom Ravida, the head girls' basketball coach, was also invited to the meeting, but could not "get off work that day" to attend. Vol. 5 pp. 138–39. Dawn L. knew that the alternative education program to which A.M. had been assigned was held at the high school, as were the basketball practices in which N.L. and M.L. intended to participate, and wanted to ensure that there would be no contact between her daughters and A.M. Vol. 3 p. 76; Vol. 5 pp. 79–80.

Dawn L. discussed in detail the sexual activities to which A.M. had subjected M.L. Vol 3 p. 77; Vol. 5 p. 81. She also discussed the first court proceeding involving A.M. and advised Parkins, Buchko and Penna of the no-contact order; that A.M. had already violated it; and that as a result they were "set to go back into court." Vol. 3 pp. 77–78; Vol. 5 pp. 80–81. Parkins then requested a copy of the no–contact order, which Dawn L. supplied on the next business day. Vol. 3 pp. 77–80; Vol. 5 pp. 81–82. Parkins *et al.* told Dawn L. that "they would not let A.M. there and that she would not be allowed to play basketball." Vol. 3 p. 80; Vol. 5 p. 79.

**42.** The Court, on the assumption that Dawn and Michael L. had removed all of their children to private school at the start of the 2006–2007 school year, had previously limited evidence of the relationship between the L. family and the District to actions before that date. Document No. 62 p. 12. To the extent that the actions involving B.L. took place after the beginning of the 2006–2007 school year, the Court notes that Defendant failed to object to such testimony at the time and has therefore waived "any post-trial objection to the admissibility of the testimony. . . ." *United States v. Knox Coal Co.,* 347 F.2d 33, 44 (3d Cir.1965) (citing *Rossetti v. United States,* 315 F.2d 86 (9th Cir.1963)).

**43.** The notification letters were passed out in homeroom as well. Vol. 5 pp. 112–13. Ms. Bulas, although claiming to have "passed envelopes out to all the students who met the [membership] criteria in [her] homeroom," testified that she "[did] not know" what was in the envelopes; that she "would not open [her students'] mail"; and that she just passes out whatever she is given from the office. *Id.* at 113. As in so much of Ms. Bulas's testimony, the Court finds her protestations that she did not know that she was passing out notifications of acceptance into the National Junior Honor Society to be less than credible.

A.M. nonetheless showed up for "[a]t least four or five" basketball practices in June of 2005.[44] Vol. 3 pp. 82–83; Vol. 4 p. 4. At one of them A.M. followed M.L. into the weight room. *Id.* at 82. Michael L. was present at the practice and followed A.M. inside; nothing was said, but A.M. "got the point." *Id.* at 83; Vol. 4 p. 7.

The June basketball practices had been part of a summer league, but starting in August there were "official" practices for the school teams. Vol. 3 p. 83. In August of 2005 Dawn L. again attempted to contact Parkins to ensure that the District would enforce the terms of the no-contact order. Vol. 3 pp. 83–85; Ex. 35 (incorrectly referred to by counsel as Ex. 25 on line 23 of Vol. 3 p. 85). She could not recall if Parkins ever spoke with her, although she did leave messages with Parkins's secretary. Vol. 3 pp. 80, 85. Dawn L. also discussed her concerns with Penna. *Id.* at pp. 87–88.

A.M. showed up at the first official practice and was asked to leave. *Id.* at 89–90. The other girls on the team then began to taunt M.L., who left the practice in tears. *Id.;* Vol. 4 p. 6. M.L. had no further involvement with basketball in the District and has not played at her new school. *Id.* at 90; Vol. 1 p. 114. A.M. did play basketball in the District and notwithstanding the no-contact order in the consent decree played with N.L. during the 2005–2006 season. Vol. 3 p. 139; Vol. 4 p. 23; Vol. 5 p. 13.

In spite of their difficulties with the District, Dawn and Michael L. took on additional responsibilities in the 2005–2006 school year. Dawn was elected co-secretary of the Big J and joined the District's parent advisory council. Vol. 3 pp. 92, 94, 104. This was on top of her work as secretary of the girls' high school soccer boosters and her involvement with the middle school parent organization and the high school girls' tennis boosters. *Id.* at 92. She also worked on the middle school yearbook. *Id.*

Michael L. was elected president of the Big J. Vol. 4 pp. 176–77. He likened it to being "a CEO of a small company," with responsibility for the concession stands "for all the games," including purchasing, staffing, and distribution of the proceeds. *Id.* at 177. He also presided over the Big J's meetings, represented it before the school board, and was the person to whom board members could direct their questions about the organization and its activities. *Id.* at 178. This took a substantial amount of time; during football season, the organization's busiest period, it involved "a few hours a day" and "four or five hours for game days." *Id.*

Michael L. also agreed to keep score for the District's girls' basketball games. Vol. 4 p. 170. In November or December of 2005, near the beginning of the girls' basketball season, Ravida approached Michael L. at a game and told him that his previous scorekeeper's job schedule had suddenly changed and that Ravida therefore needed a new scorekeeper. *Id.;* Vol. 3 pp. 102–03; Vol. 5 pp. 132–33; Joint Ex. 1

---

**44.** Ravida testified that after the meeting between Dawn L. and Parkins *et al.* he did not see A.M. "in the same gym or in the area with M.L." while he was running open gyms nor was he told that the two girls had been in the gym together. Vol. 5 p. 138. The Court cannot determine from the evidence whether Ravida ran all the open gyms or if A.M.'s appearances were otherwise not reported to him. The Court also notes that Ravida does not teach in the District and has no tenure; he is instead an at-will employee coming off a losing season. *Id.* at 139. His demeanor, moreover, was only slightly less distressed than that of Ms. Bulas. *See* n. 9, *supra.* The Court did not find Mr. Ravida to be particularly credible in general and, regarding the question of A.M.'s appearances at the gym, will credit Dawn L.'s testimony.

¶ 49. Ravida also told Michael L. that the job paid $25 per game. Vol. 3 pp. 103–04; Vol. 4 p. 170. There were approximately 23 games in the season. *Id.* at 171. Michael, who was still on disability, accepted immediately. Vol. 4 p. 170.

By January of 2006 Dawn and Michael L. had decided to file the instant lawsuit. Prior to the actual filing on January 27, 2006, Document No. 1, Dawn spoke with local television newscasters on January 6, 13, 14, and 16, 2006. Vol. 3 pp. 98–101; Vol. 4 pp. 17–18; Ex. 39–42. She was also interviewed for a story that aired on January 30, 2006. Vol 3 pp. 98–101; Ex. 43. Parkins saw at least one of the news stories and was aware that Dawn L. had been the subject of the interviews; members of the school board were also aware of newscasts. Vol. 5 pp. 58–59.

"[R]ight after" the January 13, 2006 newscast and approximately "two thirds into the [girls' basketball] season," Ravida told Michael L. that on instructions from Penna, the District's athletic director, Michael L. "couldn't be scorekeeper anymore." [45] Vol. 4 pp. 172–75; Vol. 3 pp. 102–03; Vol. 5 pp. 6, 87; Joint Ex. 1 ¶ 50. Ravida had submitted Michael L.'s name for payment, "somebody" had seen his name on the list, "and that put up a red flag." Vol. 5 p. 24; Vol. 4 pp. 172–73. Ravida told Michael L. that Michael L. "knew what was going on, but [Ravida] appreciated" his efforts.[46] Vol. 4 at 172–73; Vol. 5 p. 24. At the time, Ravida "was just dancing around the question" of why Michael L. was being terminated and "was pretty much as upset as [Michael] was." Vol. 5 p. 27. Michael L. then spoke with Penna, who told him that Parkins had told Penna that Michael L. "was no longer to keep score." [47] Vol. 5 pp. 198–99.

The District's proffered explanations for Michael L.'s termination are inconsistent and implausible. Penna testified that Michael did not have the child abuse and criminal history clearances the District required of all its volunteers and employees and was therefore ineligible to be scorekeeper. Vol. 5 pp. 57, 83–84, 86; Joint Ex. 1 ¶ 45; *see also* Ex. 37. Michael had, however, received the necessary clearances and been approved as a volunteer by the school board on September 8, 2005, several months before the start of the basketball season.[48] Vol. 5 pp. 90–92; Ex. 67 p. 4.

There was also the suggestion that Michael L. was terminated because the school board had never authorized his hiring.[49] Ex. 15; *see also* Ex. 14; Vol. 5 pp.

45. Ravida testified that he fired Michael L. "early in the season." Vol. 5 p. 135. As discussed in n. 36, *supra,* the Court does not find Ravida to have been a credible witness.

46. Ravida denied making this statement. Vol. 5 p. 136. The Court finds Michael L.'s testimony to be more credible on this point.

47. Both Parkins and Penna deny this claim. Vol. 5 pp. 93, 152. The Court found neither witness to be credible on this point or, as illustrated in its findings of fact, *infra,* to be credible in general.

48. When confronted with this fact, Penna claimed that he had been given a clearance list that had not included Michael L.'s name. Vol. 5 p. 92. After listening to Penna's testimony and considering his demeanor, the Court does not find him to have been a credible witness. For example, Penna testified at trial that he had never mentioned anything about Michael's compensation to Ravida; he had only discussed Michael's ineligibility due to his lack of proper clearances. *Id.* at 85–90. When Plaintiffs' counsel pointed out to Penna that this contradicted his earlier deposition, which had been taken in October of 2006 and in which Penna had testified that the District "was not going to permit [Michael L.] to keep score and wasn't going to pay him," Penna testified, improbably, that he remembered the conversation in which he instructed Ravida to dismiss Michael better in July of 2008 than in October of 2006. *Id.* at 89–90.

49. The Court notes that at least two other people were not immediately paid for work

9–10, 133–34. That does not, however, explain why Michael L. had to be removed as scorekeeper. In light of his willingness to volunteer for practically anything connected with the District, it seems likely that Michael L. would have agreed to continue keeping score without pay, at least until such time as the issue of authorization of payment could have been resolved. *See* Vol. 5 pp. 7, 27. Ravida did not, however, offer Michael L. that option. *Id.*

The testimony regarding the payment process itself was also inconsistent and implausible. Ravida testified that he "always" submitted applications for payment of scorekeepers to Penna for transmission to the school board. Vol. 5 p. 134. Penna, by contrast, first disclaimed any responsibility for seeing that any worker was paid, then testified that his office processed payment information and transmitted it to the District's business manager. *Id.* at 84–85. Ravida also testified that notwithstanding the practice he "always" followed, in Michael L.'s case he "didn't have time" to submit the application for payment while Michael L. was keeping score and never subsequently attempted to get him approved for payment because he "kind of got into the season, and then ... got one of the students ... to keep score...."[50] Vol. 5 pp. 134–35. Also, after testifying that it was Penna's responsibility to transmit information to the school board, Ravida went on to state that Penna had asked

*Ravida* if Michael L. had been approved for payment by the board before telling him that Michael L. could no longer serve as scorekeeper. *Id.*

Parkins and members of the school board attended District athletic events. Vol. 3 pp. 117–18; *see also* Vol. 4 p. 15. In addition, Michael L. appeared before the school board several times in his capacity as president of the Big J during the period in which he served as scorekeeper. He also "talked to Tony Penna before every home game...." Vol. 4 p. 178; Vol. 5 p. 36. The District had ample notice of Michael's work as scorekeeper and ample opportunity to discuss it with him. The Court therefore finds it vanishingly unlikely that if either Michael's clearances or approval for payment had been of any real concern to the District the District would have waited the several months between the time Michael L. was hired to keep score and the middle of January, 2006, to address them.

Indeed, the District's treatment of Kurt M., the scorekeeper whom Michael L. replaced, showed exactly how seriously the District regarded the issues of clearances and board approval. Kurt M., who was the brother of Ravida's assistant coach, had worked an entire season without clearances. Vol. 5 pp. 139–40; Ex. 67 pp. 4–5. Notwithstanding his lack of clearances he was not only allowed to complete the season but would have kept score for the

they did for the District's girls' or boys' basketball teams, and that the District may have claimed that their employment had also not been authorized by the school board. Vol. 5 pp. 23, 35; Ex. 14; Ex. 15 (letter from the District's business manager stating that the school board was "the only authority permitted to hire" and that therefore the District would "need to verify" Michael's and the others' board approval before authorizing payment). There is, however, no evidence that the others were terminated mid-season or that they were not paid at a later date. Vol. 5 p. 35. Regardless, the fact that people

other than Michael L. may not have been paid by the District does not diminish the impact of the contradictory and confusing nature of the testimony regarding his dismissal and non-payment on the Court's assessment of the plausibility of the District's proffered reasons for its actions toward Michael L.

**50.** As noted above, Michael L. testified that Ravida had told him that he had in fact submitted Michael L.'s name for payment, and that "put up a red flag" and precipitated his termination. Vol. 5 p. 24.

2005–2006 season had a change in his work schedule not made it impossible for him to do so. Vol. 5 pp. 132–33. He was evidently paid as well, even though his lack of clearances should have kept away from the scorekeeper's table, let alone off the District's payroll.[51]

At approximately the same time as the news stories about the L. family appeared, "somebody began to look into the issue of whether Dawn L. had clearance as a volunteer." *Id.* at 165. That person's identity is, however, unknown; while admitting that the investigation took place Superintendent Parkins could neither identify the investigator nor anyone who might know the investigator's identity. *Id.* at 165–66. Dawn was advised in January of 2006 that the District had lost her clearances, that she needed to get new ones, and that she could not volunteer for any activities in the District involving contact with children until she obtained such clearances. Vol. 4 pp. 8–9; Ex. 38. Dawn initially attempted to resolve the issue via e-mail with Parkins's secretary but never received an answer. Vol. 3 p. 124; Ex. 38. In the hope that she would be allowed to "continue with what [she] had been doing all along," she wrote a letter to the school board on February 14, 2006 explaining that she had obtained clearances as a condition of her employment with the District and had vol-

unteered during the previous eleven years "with no problem whatsoever." Vol. 3 pp. 123–26; Ex. 38; *see also* Joint Ex. 1 ¶ 46.

In contrast to her earlier unavailability, Parkins wrote back the next day that the District's records indicated that Dawn L. "had not been Board-approved as a volunteer" and instructed her to obtain new clearances. Vol. 3 pp. 127–28; Ex. 44. Dawn did so, and the new documents were issued by the end of February, 2006. Vol. 3 pp. 105–07; Vol. 4 p. 8; Ex. 37. She was re-approved as a volunteer on March 8, 2006. Vol. 4 pp. 9, 11.

During the two months in which Dawn L. did not have clearances, she continued to work on the middle school yearbook from home. Vol. 3 p. 122; Vol. 4 p. 10. She could not, however, participate in her committee work at the school nor could she work at the concession stands during athletic events. Vol. 4 pp. 9–12. She and Michael were also removed from their positions in the Big J by the other officers. Vol. 4 pp. 13, 17.

Dawn and Michael L. were advised by Kim Garman, co-secretary of the Big J with Dawn, that Garman had attended a school board meeting and the board had said that Dawn and Michael L. were not allowed to volunteer anymore and that since they had filed—or were filing, Dawn L.'s testimony is not clear on this point[52]

---

**51.** Ravida knew that the papers necessary to obtain payment for Kurt M. had been submitted, although he could not say if Mr. M. had in fact been paid. Vol. 5 p. 140. The Court, however, finds it unlikely that Mr. M. would have been willing to return for a second season if he had not been paid for the first; at the least he would have mentioned any nonpayment to his brother, who would in turn have mentioned it to Ravida.

**52.** On cross-examination Dawn L.'s testimony indicated that the lawsuit had been filed before the conversation with Garman. Vol. 4 p. 13. However, Dawn testified on direct examination that she had the conversation with

Garman "two days" after Michael L. had been removed from his position as scorekeeper, Vol. 3 p. 104, and Michael L. testified that he had been fired "right after" the January 13, 2006 newscast, Vol. 4 p. 185. January 13 was approximately two weeks before Dawn and Michael filed the instant suit on January 27, 2006. Document No. 1. The letters from the District to Michael L. in his capacity as president of the Big J dated February 7, 2006, Ex. 45, and May 23, 2006, Ex. 15, do not in fact contradict this timeline since, "although [Michael] was technically still supposed to be included in the Big J, [the other board members] didn't let him participate." Vol. 3 p. 122. The Court cannot, finally, determine

—the lawsuit it did not make any sense for them to try to raise money for the District.[53] Vol. 3 p. 104; Vol. 4 pp. 13, 16–17. Garman also said that if Dawn and Michael remained in the Big J that the school board would "make it difficult" for the organization by beginning to enforce its clearance policy. Vol. 4 pp. 13, 17, 180–81. That would have imposed a large burden on the organization because a "substantial number" of Big J volunteers had never obtained clearances.[54] *Id.;* Vol. 5 p. 5.

The District adopted its clearance policy on December 9, 2003. Vol. 5 pp. 148–49; Ex. D. The policy required, *inter alia,* that long-term volunteers such as Dawn and Michael L. had to be approved by the school board and that the volunteers had to obtain "Act 34/151 Clearances" at their own expense. Vol. 5 p. 55; Ex. 11 p. 4. Once the volunteers obtained the clearances, however, the clearances would be valid "until the volunteer no longer wish[ed] to provide a service to the district" or until "a twelve-month lapse of volunteer time occur[red]." Vol. 5 p. 55; Ex. 11 p. 4.

Dawn L. was employed by the District during the 2002–2003 academic year. Joint Ex. 1 ¶ 47; Vol. 3 p. 128. She was required to obtain Act 34/151 clearances as a condition of her employment and did so. *Id.;* Vol. 3 p. 106; Vol. 5 p. 57. Dawn L. did not suspend her volunteer activities during the period of her employment. Vol. 5 p. 57. Although her employment ended before the enaction of the District's volunteer policy, the Court cannot see how the clearances which were valid at the end of the 2002–2003 school year suddenly became invalid six months later. Parkins did claim at trial to have been told by the District's solicitor that volunteering is a "different job" from being a teacher's aide

from the record whether the conversation with Garman occurred before or after Dawn and Michael filed the instant lawsuit.

53. Defendant's witness Karen Gojmerac, who witnessed the conversation between Kim Garman and Dawn and Michael L., Vol. 5 p. 17, offered a different rationale. She said first that the other officers of the Big J. had asked Dawn and Michael L. to step down since the District "was making it kind of a big deal that [the Big J] tried to have all volunteers with their clearances." Vol. 4 p. 17; Vol. 5 pp. 97–98. When asked why Michael L., who undisputably had his clearances, also had to step down, Gojmerac said that it was because he would have access to the cash box from the concession stands. Vol. 5 p. 99. The following exchange ensued:

> Q: If Dawn wasn't going to be there working out of a cash box, what difference would it make if Mike was there since he had his clearance?
> A: She had access to the keys to the cash box.
> Q: Now, the clearances don't have anything to do with honesty, do they? Don't they have to do with criminal record and child abuse?

> A: I believe so, yes.
> Q: Okay. And so since Dawn didn't have clearance he couldn't take the cash box home because you couldn't trust her; is that right?
> A: No. Whenever they, whenever the officers have a cash box that meant they were responsible for running the concession stand. And to work in the concession stand you had to have the clearances.
> Q: Now, are you, now, does that mean that anyone who's in the Big J who's married whose spouse isn't a volunteer or who's active and, therefore, doesn't have a clearance would have to also quit the Big J and step down until their spouse got clearance?
> A: No, because they would not have a cash box.

Vol. 5 p. 100. The Court has, needless to say, afforded Ms. Gojmerac's testimony little credence.

54. By way of illustration, of the 149 people who volunteered to work for the Big J at events in September and October of 2005, only 32 had obtained clearances and been approved by the board. Vol. 4 pp. 183–84; Vol. 5 pp. 3–4; Ex. 76.

and that "[a]ny time someone's doing another job they're required to get the new clearance." Vol. 5 p. 57. Parkins was not, however, "sure" when she received this opinion. *Id.* There is, moreover, nothing else in the record to suggest that it was ever issued or that it was ever adopted as District policy.

By September and October of 2005, nearly two years after the District adopted its clearance policy, 117 out of 149 volunteers at Big J-related activities during a six-week sample period did not have clearances. Vol. 5 pp. 162–63; Ex. 76. As of February 7, 2006, the District could point to only two individuals against whom it had ever enforced the policy, Dawn L. and a Mr. G., and Mr. G. "had a criminal record" for "trespassing against the School District."[55] Vol. 5 pp. 163–64; Ex. R. Notably, one person against whom the District had not enforced the policy was Philip Garman, an officer of the Big J at the time Dawn and Michael L. were removed as officers of the organization who did not obtain his own board approval until March 8, 2006. Vol. 5 pp. 26, 102, 104; Ex. 67 p. 3. That was, coincidentally, the same date as Dawn L.'s re-approval after her removal from the Big J. Vol. 4 pp. 9, 11.

By February of 2006 Dawn and Michael L. had "had enough" and decided to remove their three daughters from the District beginning with the 2005–2006 school year. Vol. 3 pp. 138–39; Vol. 5 p. 13. They felt that "[e]verything had snowballed" since January of 2005. Vol. 3 pp. 138–39. They did not think that A.M. had been punished in any meaningful way by the District and, moreover, the District was ignoring the no-contact order that remained in effect. *Id.* at 139–40; Vol. 5 p. 13. Specifically, the District was excusing

A.M. from classes at the alternative school, which met after regular school hours, to attend basketball practices with, among others, N.L. Vol. 3 pp. 139–41; Vol. 5 p. 13. Michael L. was "willing to live with" his treatment by the District but not to tolerate A.M. being allowed to play basketball with N.L. Vol. 5 p. 13. Dawn and Michael L. were also aware that "[A.M.] was going to be out of alternative school very shortly and [their] kids would all have to be in classes with her . . . ." Vol. 3 p. 141. In addition, Dawn and Michael L. felt that the school's treatment of them was a "slap in the face." *Id.* at 142.

The only practical alternative available to the L. family was Bishop McCort High School, a local Catholic institution, and Dawn and Michael enrolled their three daughters in McCort for the 2005–2006 school year. *Id.* at 144; Vol. 5 p. 14; Joint Ex. 1 ¶ 43. Tuition was $4,950 per girl per year. Vol. 3 p. 145; Ex. 21; Ex. 31. M.L. was allowed to skip eighth grade and be admitted as a ninth-grader, thus saving a year's tuition. Vol. 3 p. 148. This has not been an unalloyed blessing; M.L.'s grades have slipped and she has started getting "some Cs." Vol. 3 p. 155. The Pennsylvania Victims Compensation Assistance Program paid for the first two years of M.L.'s education at McCort. Vol. 3 pp. 152–53; Ex. 21. It will not, however, contribute further to her tuition and the L. family will have to reimburse the fund in the event of a recovery in this case. Vol. 3 p. 153; Ex. 21. Regardless of payor, the total cost of M.L.'s four years at McCort will be $20,590. Vol. 5 p. 15; Ex. 21.

Dawn and Michael's other two daughters, C.L. and N.L., were both able to obtain scholarship aid and have since grad-

---

**55.** Parkins claimed that "to the best of [her] recollection" the District had enforced the policy "as to other individuals since [she had] been superintendent" but offered no addition- al examples. Vol. 5 p. 167. In the absence of any supporting evidence the Court will not credit her testimony on this point.

uated from McCort. *Id.;* Vol. 3 pp. 150–51. Costs for their education total $12,470. Ex. 21 p. 1. Dawn and Michael have paid McCort only a minimal amount to date. Vol. 3 p. 150; Ex. 21 p. 1. They will reimburse McCort from any proceeds from this lawsuit but regardless of their recovery will remain liable for any outstanding balance. Vol. 3 pp. 148–49.

Dawn and Michael L.'s youngest child, B.L., remains in the District. *Id.* at 151. The Johnstown area's Catholic elementary and middle schools are on "tight budgets"; they cannot defer payments in the fashion of McCort and Dawn and Michael L. lack the resources to pay even M.L.'s tuition at this time. *Id.* at 153. In addition, all of B.L.'s friends are in the District; B.L. still does not know much if anything of what happened between M.L. and A.M.; he has no contact with A.M.; and A.M. will have graduated from high school by the time B.L. enters ninth grade. Vol. 5 p. 31. The L. family would remove B.L. from the District if it could afford to do so; Dawn L. does not "feel that B.L. will be treated the way he should be treated [by the District] now." Vol. 3 pp. 151–52.

## II. CONCLUSIONS OF LAW

### A. Student-on-student sexual harassment

■ Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although the statute's "express means of enforcement" is limited to action "by administrative agencies," the Supreme Court has found an implied private right of action for monetary damages. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 283–84, 288, 118 S.Ct. 1989, 1996, 1998, 141 L.Ed.2d 277, 287–88 (1998) (cita-

tions omitted); *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 62–63, 76, 112 S.Ct. 1028, 1031, 1038, 117 L.Ed.2d 208, 215, 224 (1992) (citing *Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). This implied right of action permits recovery for student-on-student sexual harassment under "certain limited circumstances. . . ." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 643, 650, 119 S.Ct. 1661, 1671, 1675, 143 L.Ed.2d 839, 854, 858 (1999).

■ To prevail in a claim of student-on-student sexual harassment under Title IX, the plaintiff must show that (1) the defendant received federal funds; (2) sexual harassment occurred; (3) the harassment took place under "circumstances wherein the [funding] recipient exercise[d] substantial control over both the harasser and the context in which the ... harassment occurred"; (4) the funding recipient had "actual knowledge" of the harassment; (5) the funding recipient was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school." *Davis,* 526 U.S. at 645, 650, 119 S.Ct. at 1672, 1675, 143 L.Ed.2d at 858. Two of these elements, funding and control, are not at issue in the instant action. Defendant admitted at trial that it receives federal funds. The Court excluded from the harassment action at the summary judgment stage any acts by A.M. that occurred "outside of the School. . . ." *Dawn L. v. Greater Johnstown Sch. Dist.,* Civil Action No. 3:2006-19, 2008 WL 857453, at *10 n. 3, 2008 U.S. Dist. LEXIS 25705, at *32 n. 3 (W.D.Pa. March. 31, 2008). A.M.'s remaining acts of alleged harassment, which took place "during school hours and on school grounds," were, as a matter of law, under the Dis-

trict's "substantial control." *See Davis,* 526 U.S. at 645–46, 119 S.Ct. at 1672–73, 143 L.Ed.2d at 855–56. The Court will take up the remaining elements in order.

### Sexual harassment

■ To constitute sexual harassment the conduct at issue must first be unwelcome. United States Dep't of Educ. Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties 7 (Jan.2001), http://www.ed. gov/about/offices/list/ocr/docs/shguide.pdf. [hereinafter Harassment Guidance]; *see also Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49, 58 (1986) (citations omitted) (noting that guidelines promulgated by the agency charged with enforcement of a law, although "not controlling upon the courts ... do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"); *Stroehmann Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters,* 969 F.2d 1436, 1441 (3d Cir.1992) (citing *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404, 91 L.Ed.2d 49, for the proposition that unwelcomeness is the gravamen of a sexual harassment complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*).[56] The unwelcome conduct may include "sexual advances, requests for sexual favors, and other verbal or physical

conduct of a sexual nature," *Stroehmann,* 969 F.2d at 1442 (citing 29 C.F.R. § 1604.11(a) (1991)), and, indeed, the District's own sexual harassment policy uses almost identical language to define harassing conduct. Vol. 2 p. 153. Assessment of welcomeness depends upon the age of the alleged victim and "younger children" may not have "the capacity to welcome sexual conduct" under any circumstances. Harassment Guidance 8, http://www.ed. gov/about/offices/list/ocr/docs/shguide.pdf; *see also Davis,* 526 U.S. at 651, 119 S.Ct. at 1675, 143 L.Ed.2d at 859 (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); OCR Title IX Guidelines 12041–42). Even "[a]cquiescence in the conduct or failure to complain does not always mean that the conduct was welcome." Harassment Guidance 8, http://www.ed. gov/about/offices/list/ocr/docs/shguide.pdf.

■ The Court is not convinced that an 11–year–old girl who appeared from contemporaneous photographs to be completely asexual and who suffered from such severe psychological problems that she could not say "hello" or "goodbye" to her teacher or order a soda at a restaurant had the capacity to welcome demands for sexual favors from an eighth grade girl or to consent to sexual activity up to and including digital penetration of her vagina.[57] There is, moreover, the highly credi-

---

**56.** Title VII jurisprudence is regularly applied by the courts to cases brought under Title IX. *Olmstead v. L.C. ex rel Zimring,* 527 U.S. 581, 616 n. 1, 119 S.Ct. 2176 n. 1, 2194–95, 144 L.Ed.2d 540, 568 n. 1 (1999) (Thomas, J., dissenting); *see also Davis,* 526 U.S. at 651, 119 S.Ct. at 1675, 143 L.Ed.2d at 859 (citing *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2399; *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)) (defining student-on-student harassment under Title IX in terms of Title VII decisions); *Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 205–06 (3d Cir.2001)

(citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Title VII case); *Meritor,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49) (noting that a cause of action in harassment under Title IX is grounded in the hostile working environment jurisprudence of Title VII).

**57.** Parkins conceded as much when she admitted, without even mentioning the possible impact of a child's psychological problems on the issue of consent, that "11 year olds are vulnerable to people who are older, either adults or other kids...." Vol. 5 p. 53.

ble testimony of both Officer Wagner and M.L. herself that the contact was not in the least welcome. The District's contrary position, that the sexual "relationship" between A.M. and M.L. was consensual is at best a display of an extraordinary lack of judgment; the argument is certainly not supported by the evidence. In addition, Parkins, Peterman and Buchko all testified that in the case at bar Dawn L.'s wishes and not her daughter's controlled and Dawn L. made it pellucidly clear to Buchko on January 14, 2005 that because of the sexual activity alluded to by Paula B. on January 13, 2005 Dawn L. wanted A.M. to have no further contact of any sort with M.L.

For the foregoing reasons, the Court finds that any physical contact of a sexual nature or any notes from A.M. seeking such contact were unwelcome and hence constituted harassment. Such conduct encompassed all of A.M.'s sexual assaults against M.L. in the middle school bathroom, including the assault on January 18, 2005, as well as the notes A.M. passed to M.L. on January 19 and 21, 2005 requesting sexual favors and the note from March 23, 2005 seeking a renewal of the girls' "friendship."

**Actual knowledge**

■ Actual knowledge is predicated on notice to an "appropriate person." *Gebser*, 524 U.S. at 290, 118 S.Ct. at 1998, 141 L.Ed.2d at 291 (citing 20 U.S.C. § 1682). An appropriate person "is, at minimum, an official of the recipient entity with the authority to take corrective action to end the discrimination." *Id.* A principal "entrusted with the responsibility and authority normally associated with that position will ordinarily be an 'appropriate person'" for purposes of Title IX. *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 171 (3d Cir.2002). Buchko's own testimony revealed that he possessed the requisite authority and responsibility. Dawn L.'s

notice to Buchko on January 14, 2005 and January 21, 2005, and Officer Wagner's and her superior's notice to Buchko on February 7, 2005, were therefore directed to an appropriate person. Peterman and Parkins had far more authority than Buchko. Dawn L.'s notice to Peterman on January 21, 2005 and Officer Wagner's and her superior's notice to Parkins on February 7, 2005 were therefore also directed to appropriate persons.

■ Actual knowledge requires more than the awareness of a mere possibility of harassment but less than absolute certainty that harassment has occurred. *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir.2005). Instead, "[a]n educational institution has 'actual knowledge' if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* at 361 (quoting 3C Fed. Jury Prac. & Instr. § 177.36 (5th ed.2001)). The *Bostic* court noted that the jury instruction quoted above was derived from *Rosa H. v. San Elizario Indep. Sch. Dist*, 106 F.3d 648, 653 (5th Cir.1997), *Bostic*, 418 F.3d at 361, and, indeed, the formulation in *Rosa H.*, that there is actual knowledge "when the school district [knows] that there [is] a substantial risk that sexual abuse [will] occur," *Rosa H.*, 106 F.3d at 652–53, states the proposition with greater clarity. The Seventh Circuit has furnished an instructive gloss on the concept, finding actual knowledge where there are risks of harassment "so great that they are almost certain to materialize if nothing is done...." *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir.2004).

Notably, all of the above formulations look only to the sufficiency of the information imparted by the complainant. At trial Defendant's counsel questioned Dawn L. at length about what she thought certain evidence might have meant. That is not,

however, relevant to the instant inquiry except insofar as she communicated those conclusions to the District and, in any event, there is more than enough objective evidence for the Court to determine that the District was aware of substantial danger to M.L.

■ The Court has found that on January 14, 2005, Dawn L. informed Buchko that she had found suggestive notes from A.M. to M.L.; that Paula B. had indicated that she had found notes indicating a sexual relationship between A.M. and M.L. and that her family would disown her if they learned that A.M. was a lesbian; that M.L. suffered from serious psychological problems including, possibly, Asperger's Syndrome; that Mr. Mayes had contacted Dawn L. about M.L.'s tearful refusal to enter the middle school cafeteria on more than one occasion; and that Dawn L. found further contact of any sort between A.M. and M.L. to be unwelcome. During his meeting with Dawn, Buchko also learned from Ms. Bulas that M.L. had, on multiple occasions, returned to class red-faced and crying. The Court finds that these underlying facts, when taken together, indicated a substantial danger and that therefore the District had actual knowledge on January 14, 2005 that M.L. was being or would be subjected to sexual harassment at the middle school.

The Court has found that on January 21, 2005, in a telephone call instructing the District to have M.L. ready for her father to take her home, Dawn L. informed Buchko that she had found more notes; that something had happened at the middle school; that she felt he had not done anything as a result of their meeting on January 14, 2005; and that she had to hang up to let the police into her house. The Court finds that these facts alone would have been sufficient to indicate a substantial danger to M.L.

Dawn L., however, provided further notice to the District on January 21, 2005 when she handed the notes from A.M. to M.L. to Peterman. The Court finds that in the context of the other facts known to the District on that date the notes established to a near certainty that A.M. had sexually harassed M.L. at the middle school and would do so again, thereby augmenting the District's actual knowledge.

Whether Peterman actually read the notes is irrelevant to the issue of notice. In light of Peterman's telephone conversation with Buchko and the information imparted by Dawn L. on January 21, 2005, the Court finds that Peterman's failure to read the notes, if such failure occurred, was neither negligent nor foolish, but instead done "with a conscious purpose to avoid learning the truth." *United States v. Stewart,* 185 F.3d 112, 126 (3d Cir.1999). Under such circumstances the Court may and shall infer that Peterman and hence the District had knowledge of the contents of the notes. *Id.; see also United States v. Leahy,* 445 F.3d 634, 652 (3d Cir.2006); *United States v. Wasserson,* 418 F.3d 225, 237 (3d Cir.2005).

The District received further notice at the meeting on February 7, 2005, at which Officer Wagner presented notes from A.M. "which were highly suggestive of sexual encounters in the school bathroom," Joint Ex. 1 ¶ 32, and Wagner's superior advised Parkins and Buchko "that a criminal act may have occurred on school property and a police investigation should have been done." Ex. 5 p. 5. The Court again finds that this information was more than sufficient to alert the District to the substantial danger A.M. posed to M.L. and that the District therefore had actual knowledge at this time as well.

Buchko's interview with A.M. on February 10, 2005 provided the District with

further notice of the substantial danger to M.L. Finally, the District received notice on or about March 23, 2005 when Buchko was given A.M.'s last note to M.L. In the context of the underlying facts known to the District at that time, passing the note was, as discussed above, an act of harassment. The District indicated as much when it suspended A.M. for passing the note.

**Deliberate indifference**

 To establish deliberate indifference, a plaintiff must show "an official decision by the recipient [of federal funds] not to remedy the violation[s]." *Gebser*, 524 U.S. at 290, 118 S.Ct. at 1999, 141 L.Ed.2d at 292. School administrators receive substantial deference in cases of alleged student-on-student harassment; victims of harassment have, for example, no "right to make particular remedial demands." *Davis*, 526 U.S. at 648, 119 S.Ct. at 1674, 143 L.Ed.2d at 857. Indeed, "funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49, 119 S.Ct. at 1674, 143 L.Ed.2d at 857.

The reasonable response doctrine implies a duty on the part of the funding recipient, upon notice of possible sexual harassment, to promptly investigate and if necessary to take remedial action. *Granger v. Klein*, 197 F.Supp.2d 851, 872–73 (E.D.Mich.2002); *Morlock v. West Cent. Educ. Dist.*, 46 F.Supp.2d 892, 911 (D.Minn., 1999); Harassment Guidance 15, http://www.ed.gov/about/offices/list/ocr/docs/shguide.pdf; *see also Andreoli v. Gates*, 482 F.3d 641, 643–44 (3d Cir.2007) (citations omitted) (finding, in a hostile work environment case under Title VII, "an employer's actions to be adequate, as a matter of law" where the employer investi-

gated the employee's complaint "within a day" of notification and took prompt action to eliminate the harassment). The District's own sexual harassment policy acknowledged as much, requiring that "complaints of harassment ... be investigated promptly and corrective action be taken when allegations are verified." Vol. 2 p. 152. In addition, Parkins has admitted that upon notice of possible harassment a principal within the District has a duty to investigate independently of any police investigation, even if the alleged incident "might involve criminal conduct...." Vol. 5 pp. 53–54.

 Dawn L.'s notice to the District on January 14, 2005 triggered the District's duty to investigate. Her subsequent, far more detailed notice to the District on January 21, 2005 and the notice provided by Officer Wagner and her superior at the February 7, 2005 meeting, at which they advised the District that a crime had probably been committed, further underscored that duty. The District, however, conducted no investigation of any sort until Buchko's interview with A.M. on February 10, 2005, almost four weeks after Dawn L.'s original complaint.

Dr. Peterman testified that a proper investigation would have involved speaking with both M.L. and A.M., interviewing A.M.'s mother, and talking to adults at the middle school who either might have seen the two girls together or observed behavior problems with either or both of the girls. Vol. 2 pp. 162–63. That seems to the Court to be eminently reasonable. By contrast, the District's investigation consisted of Buchko's interview with A.M. on February 10, 2005; undefined inquiries sufficient to determine that the note recovered on March 23, 2005 was from A.M. to M.L.; and a second interview of A.M. by Buchko on either April 5 or 6, 2005, during which she was notified that she was being

suspended from school. No representative of the District ever spoke with M.L. or any of the adults at the middle school other than Officer Wagner about possible harassment of M.L. by A.M. and there is no evidence that anyone from the District spoke with Paula B prior to A.M.'s suspension and subsequent removal from the middle school in April of 2005.

The District's actual responses comprise a compendium of the patently unreasonable. After Dawn L.'s initial notice of a substantial danger of sexual harassment Buchko's sole remedy was to advise Christine Bulas, one of M.L.'s team of teachers, to "keep an eye out" for M.L. and A.M. This instruction was never communicated to the other five teachers on M.L.'s teaching team nor did Buchko say anything to any member of A.M.'s teaching team. Buchko also offered no explanation for his instructions to Ms. Bulas, who only learned why she was supposed to have been keeping an eye out on March 11, 2005, when Dawn L., in a meeting which neither Buchko nor any of his superiors attended, informed M.L.'s teaching team of the sexual assaults to which A.M. had subjected her daughter.

Peterman's response to the notice provided by Dawn L. on January 21, 2005 was equally feckless. Instead of instituting an immediate investigation that would have confirmed the January 18, 2005 assault in the middle school bathroom and almost certainly resulted in A.M.'s removal from the middle school Peterman offered Dawn L. no practical choice except to remove M.L. from the middle school and place her on homebound instruction. A.M. was, by contrast, permitted to remain at the middle school and was in fact not even questioned.

Homebound tutoring provided parity with in-school instruction in neither the quantity nor quality of the teaching; it was clearly inferior on both counts. Peterman nonetheless eschewed even an opportunity to mitigate the quality of the instruction; she was never "available" when Dawn L. called to complain about Raymond Zonin's ineptitude and, in fact, had no further contact with the L. family prior to Dawn L.'s call notifying Peterman that M.L. would be returning to the middle school.

Parkins's actions were if anything even less reasonable than those of Buchko and Peterman. At the time of the February 7, 2005 meeting Parkins was not aware of Dawn L.'s notifications of January 14 and January 21, 2005, but knew only that the meeting was to address Buchko's claim that Officer Wagner had accused him of covering up a sexual assault. It seems to the Court that upon learning for the first time of a possible sexual assault in a school for which she had ultimate responsibility a reasonable school superintendent might well inquire about its particulars and why, contrary to policy, she had not been notified earlier. In fact, however, prior to the meeting Parkins made no effort to determine whether an assault had actually taken place and did not even know that the L. family was involved. Even at trial she was unconcerned that she had not been told of the possible assault until February 3 or 4, 2005.[58]

Notwithstanding that during the February 7, 2005 meeting Officer Wagner and her superior presented notes from A.M. that "were highly suggestive of sexual encounters in the school bathroom," Joint Ex. 1. ¶ 32, and informed Parkins that a criminal act might have been committed on

---

**58.** The record does not permit the Court to fix the date more precisely, but Dawn L. spoke with Officer Wagner for the first time on February 3, 2005 and the February 7, 2005 meeting had been scheduled by the time Officer Wagner attempted to phone Buchko on February 4, 2005.

school property and that "a police investigation should have been done," Ex. 5 p. 5, Parkins admitted that the meeting itself was focused not on the assault but rather on "friction" between the District and the Johnstown Police Department. Indeed, her notes from the meeting indicate that her attention to "the incident itself" was "pretty sketchy." Vol. 5 p. 44; Ex. J. Parkins's attention to M.L.'s case remained pretty sketchy throughout and she had no further involvement with the matter until April 5, 2005, when Buchko contacted her about suspending A.M.

Buchko's actions after February 7, 2005 were also unreasonable. When he finally did speak with A.M. on February 10, 2005 he merely warned her that sexual encounters in the school bathroom and the passing of salacious notes were not activities that belonged in school and that A.M. should stay away from M.L. at any District activities or functions. Although Officer Wagner, who also attended the meeting, "felt she had enough evidence to warrant the filing of criminal charges against A.M.," Joint Ex. 1 ¶ 34, Buchko did not do more because, he claimed at trial, "this [was] the first time that [he was] seeing any kind of vulgarity in any type of note." Vol. 4 p. 102.

The inadequacy of response demonstrated by Buchko's warnings to A.M. transcended the merely unreasonable; they were, on the facts of this case, unconscionable. By the end of the February 10, 2005 meeting, after an investigation amounting to little more than a review of the notes in evidence as Exhibits 1 and 1.1 and his discussion with A.M., he had information sufficient to show that it was at least highly probable that A.M. had sexually assaulted M.L. in the middle school bathroom on January 18, 2005, yet he merely told A.M., in effect, "don't do it again." Even that admonition was an empty gesture; Buchko had no evidence that A.M. had directed

her attentions to anyone but M.L. and M.L.'s parents had removed her from the middle school on January 21, 2005. Buchko further demonstrated his indifference when he failed to sanction A.M. after she violated his orders by attempting, on February 13, 2005, to send flowers and notes from the school to M.L. for Valentine's Day.

Most notably, Buchko took no measures on or after February 10, 2005 to allow M.L. to return to the middle school. M.L.'s eventual return was instead engineered by Dawn L. and Officer Wagner at the March 11, 2005 meeting, which was attended by neither Buchko, Peterman, nor Parkins. Peterman did set up the meeting, however, albeit at Dawn L.'s request. Peterman's action constituted the District's first move in the direction of a reasonable response in the nearly two months since the District's initial notice, although its *de minimis* nature indicated a level of interest and involvement not reasonably related to the magnitude of the injury suffered by M.L. The District instead remained largely indifferent; it was left to Dawn L. to take "steps to remedy [the hitherto dangerous] situations on [her] own." Vol. 3 p. 190.

Buchko was aware of A.M.'s final note to M.L. on or about March 23, 2005, the day it was passed. Although he viewed this as a Level 4 offense, equivalent under the District's disciplinary code to a weapons or drug violation, he took no action until Officer Wagner informed him on April 5, 2004 that she was preparing to file criminal charges against A.M. and asked him if there was any action the District could take under its disciplinary code. To be reasonable a response must be prompt. *See Andreoli*, 482 F.3d at 643–44. Buchko's was not. As discussed in n. 36, *supra*, the Court has rejected Buchko's claim that the Easter recess prevented him from re-

sponding more promptly to this Level 4 offense. Indeed, the Court finds it more likely than not that the District would have done nothing about the note absent the impetus furnished by Officer Wagner.

**Deprivation of access to educational opportunities and benefits**

 Claims of harassment under Title IX are, in effect, claims for the creation of a "hostile [educational] environment." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir.2001). The concept of hostile environment originated in employment claims under Title VII, where it was characterized as "harassment so severe or pervasive as 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60). Similarly, in a claim for student-on-student sexual harassment under Title IX the "plaintiff must establish sexual harassment that is severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651, 119 S.Ct. at 1675, 143 L.Ed.2d at 859 (citing *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405). To do so the plaintiff need not show "physical exclusion," but must present evidence of more than "teasing and name-calling." *Davis*, 526 U.S. at 651–52, 119 S.Ct. at 1675, 143 L.Ed.2d at 859. The plaintiff must also show that the harassment had "the systemic effect of denying the victim equal access to a program or activity"; there is no cause of action for deliberate indifference to a single instance of "one-on-one peer harassment," no matter how severe.[59] *Davis*, 526 U.S. at 652–53, 119 S.Ct. at 1676, 143 L.Ed.2d at 860 (holding that, "[a]lthough, in theory, a single incident of sufficiently severe ... harassment could ... have such an effect," it was "unlikely that Congress would have thought such behavior sufficient ... in light of the inevitability of student misconduct and the amount of litigation that would [thereby] be invited ...").

 The information Dawn L. gave Buchko on January 14, 2005, when taken with Ms. Bulas's account of M.L. returning from the bathroom on multiple occasions red-faced and in tears, was sufficient to establish a substantial danger that A.M. had for some time been subjecting M.L. to unwanted sexual contact in the middle school bathroom. To ratify the obvious, the Court finds that this activity constituted a pattern of harassment that was severe, pervasive, and objectively offensive. The District's inaction after the January 14, 2005 notice allowed A.M. to subject M.L. to another sexual assault on January 18, 2005, and to pass M.L. two harassing notes on January 19 and 21. When advised of this continued pattern of severe, pervasive and objectively offensive harassment on January 21, 2005 neither Buchko nor Peterman expressed any willingness to protect M.L. and the only practical alternative presented to Dawn L. by the District was to remove M.L. from the middle school and place her on homebound instruction.

**59.** In this Title IX jurisprudence diverges from that of Title VII, where "a single unwelcome physical advance can seriously poison the victim's working environment." *Stroehmann*, 969 F.2d at 1442 (endorsing EEOC Policy Guidance: Sexual Harassment, N–915.035). The Supreme Court justified this limitation on students' rights under Title IX by the need to "reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to [frequently untoward] student behavior, realities that Congress could not have meant to be ignored." *Davis*, 526 U.S. at 653, 119 S.Ct. at 1676, 143 L.Ed.2d at 860.

This physical exclusion, which lasted from January 21, 2005 until March 15, 2005, was a clear denial of M.L.'s right of equal access to the District's resources and opportunities. M.L. received no tutoring between January 21, 2005 and February 10, 2005, when her homebound instruction was to begin. When her tutor, Raymond Zonin, did show up he arrived late and left early, never providing even the five instructional hours per week that the District required. Such instruction as Zonin did provide was inadequate at best, merely repeating lessons already learned when not simply ignoring the curriculum established by the District, and at no time did Zonin supply the type of enrichment mandated by M.L.'s GIEP.

More generally, the sexual assault on January 18, 2005 and the notes transmitted from A.M. to M.L. on January 19 and 21 and March 23, 2005, as parts of a pattern of severe, pervasive, and objectively offensive harassment, all contributed to a denial of M.L.'s educational opportunities even while she was in school. As discussed in n. 40, *supra*, M.L.'s sixth grade report card showed an immediate decline in her grades from those of the previous year. While such a decline is not by itself sufficient to prove denial of educational opportunities it does link M.L.'s education with A.M.'s misconduct. *Davis*, 526 U.S. at 652, 119 S.Ct. at 1676, 143 L.Ed.2d at 859. This decline in grades, when taken together with the "persistence and severity" of A.M.'s actions; the fact that these actions included "numerous acts of objectively offensive touching"; and that A.M.'s conduct rose to the level of criminal activity allows the Court to conclude that M.L.

suffered a general denial of her educational opportunities during her sixth grade year from its beginning in the fall of 2004 until A.M. was removed from the middle school in April of 2005. *Id.* The Court notes, however, that since liability for harassment under Title IX is predicated on notice, the District is only liable for that part of the systemic denial of M.L.'s in-school educational benefits that occurred after Dawn L.'s first notice to the District on January 14, 2005.

**Conclusion**

A.M. sexually harassed M.L. at the Johnstown Middle School during the 2004–2005 school year.[60] The District is liable for that portion of the harassment that occurred between January 14, 2005 and April 6, 2005, the last day on which the two girls were at the middle school together.[61]

**B. Retaliation**

The Supreme Court has also recognized a private right of action under Title IX "where the funding recipient retaliates against an individual because he has complained about sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171, 125 S.Ct. 1497, 1502, 161 L.Ed.2d 361, 369 (2005). It has not, however, provided a comprehensive scheme for the analysis of such claims. *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1125 (E.D.Cal.2006); *see generally Jackson*, 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361. This Court will therefore, as it has earlier in this opinion, apply the well-settled jurisprudence of Title VII to the case *sub judice*. *See Olmstead*, 527 U.S. at 616 n. 1, 119 S.Ct. at 2195 n. 1, 144

---

**60.** The Court previously granted summary judgment to Defendant on the issue of A.M.'s harassment of M.L. during basketball practices in 2005. *Dawn L.*, 2008 WL 857453, at *12, 2008 U.S. Dist. LEXIS, at *40–41.

**61.** As discussed in n. 37, *supra*, the Parties' stipulation that the girls' last day together was April 4, 2005 is erroneous. Since, however, A.M.'s last act of harassment occurred on March 23, 2005, the two-day discrepancy is not significant.

L.Ed.2d at 568 n. 1 (Thomas, J., dissenting); *Burch,* 433 F.Supp.2d at 1125 (citing *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir.2000)); *Brierly v. Deer Park Union Free Sch. Dist.,* 359 F.Supp.2d 275, 290 (E.D.N.Y.2005) (citations omitted).

### Elements

 To make out a prima facie case of retaliation, the plaintiff must show that (1) "he ... engaged in a protected ... activity"; (2) the funding recipient subjected him to "an adverse ... action after or contemporaneous[ly] with the protected activity"; and (3) "a causal link exists between the protected activity and the adverse action." *Weston v. Pennsylvania,* 251 F.3d 420, 430 (3d Cir.2001). Protected activities include complaints of sexual discrimination to the courts, government agencies, or the funding recipient. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345, 360 (2006); *see also Jackson,* 544 U.S. at 180–81, 125 S.Ct. at 1508, 161 L.Ed.2d at 375 (holding that "if retaliation were not prohibited, Title IX's enforcement scheme would unravel .... and the underlying discrimination would go unremedied"). Plaintiffs "need not prove the merits of the underlying discrimination complaint"; they need only show a "good faith, reasonable belief that a violation existed." *Moore v. City of Phila.,* 461 F.3d 331, 344 (3d Cir.2006). So long as it is "possible to discern from the context of the statement" that an individual opposed an unlawful practice, public expressions of opposition, including interviews with the press, are also protected.[62] *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135–36 (3d Cir.2006) (citing *Hoffman v. Rubin,* 193 F.3d 959, 963 (8th Cir.1999); *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 702 (3d Cir.1995); *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012–13 (9th Cir.1983)); *see also Jackson,* 544 U.S. at 176 & n. 1, 177, 125 S.Ct. at 1505 & n. 1, 1506, 161 L.Ed.2d at 372 & n. 1 (citing *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969)) (finding the protected action under Title IX to be "advocacy" of the rights of others).

 The adverse action in the second element of the prima facie case must be "materially adverse" such that it "might well have dissuaded a reasonable [person in the plaintiff's position] from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68–70, 126 S.Ct. at 2415–16, 165 L.Ed.2d at 359–61. Mere "petty slights or minor annoyances" are not, therefore, material. *Burlington,* 548 U.S. at 68, 126 S.Ct. at 2415, 165 L.Ed.2d at 360. Whether a slight is petty or material depends on the context in which it occurred, *Burlington,* 548 U.S. at 69, 126 S.Ct. at 2416, 165 L.Ed.2d at 360, and determination of materiality is based on the alleged retaliatory act itself, "not the

---

**62.** *Curay–Cramer* is a Title VII case. *Curay–Cramer,* 450 F.3d at 133. Title VII forbids retaliation not only for participation in "any manner in an investigation, proceeding, or hearing under [the statute]," but for opposition to an unlawful practice as well. 42 U.S.C.2000e–3(a). Similarly, the Supreme Court has held that Title IX protects "those who oppose discrimination against others." *Jackson,* 544 U.S. at 176, 179–80, 125 S.Ct. at 1506–07, 161 L.Ed.2d at 375 (quoting *Sullivan v. Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969)). In light of the "broad reach" of Title IX and the admonition that the Court must accord Title IX "a sweep as broad as its language," *Jackson,* 544 U.S. at 175, 125 S.Ct. at 1505, 161 L.Ed.2d at 371 (quoting *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982)), as well as the general applicability of Title VII case law to Title IX cases, the Court has no problem concluding that Title IX's protection also extends to individuals who make statements to the press in opposition to discrimination.

underlying conduct that forms the basis of the [Title IX] complaint." *Compare Burlington,* 548 U.S. at 77–78, 126 S.Ct. at 2420–21, 165 L.Ed.2d at 365–66 (Alito, J., concurring) (arguing that the majority's holding "implie[d] that the degree of protection afforded the victim of retaliation is inversely proportional to the severity of the original act of discrimination ...") *with id.,* 548 U.S. at 69, 126 S.Ct. at 2416, 165 L.Ed.2d at 360–61 (specifically rejecting Justice Alito's argument).

For the third prong of the prima facie case of retaliation, Plaintiffs must show that the adverse action was motivated by "retaliatory animus," *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281, 284 (3d Cir.2000), and that this animus had a "determinative effect" on the complained-of decision. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 935 (3d Cir.1997). The Court must consider "a broad array of evidence" in making its determination. *Farrell,* 206 F.3d at 281, 284 (citation omitted).

▮▮▮As an initial matter, Plaintiffs must show that the party or parties who took the adverse actions were aware of Plaintiffs' protected activities. *Andreoli,* 482 F.3d at 650; *Weston,* 251 F.3d at 433 (citing *Jones v. School Dist. of Phila.,* 198 F.3d 403, 415 (3d Cir.1999)). If they were, "unusually suggestive" temporal proximity of the Plaintiffs' and Defendant's actions can by itself establish the necessary causal link. *See LeBoon v. Lancaster Jewish Cmty. Ctr.,* 503 F.3d 217, 232 (3d Cir.2007) (citing *Clark County v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989)). A gap of two days has been held to be unusually suggestive; a gap of three months is not. *Id.* at 232–33 (citations omitted). Lack of temporal proximity is not fatal, however, and the passage of "almost two years" or indeed any period of time, is "not legally conclusive proof against retaliation." *Robinson*

*v. Se. Pa. Transp. Auth.,* 982 F.2d 892, 894–95 (3d Cir.1993).

▮▮▮ "Intervening antagonism" is another factor that is commonly used to show retaliatory animus. *See LeBoon,* 503 F.3d at 232–33. That antagonism must, however, have arisen at the time of or after the protected activity. *Id.* at 233–34; *see also Robinson,* 982 F.2d at 895 (finding that the employer subjected Robinson to a "constant barrage" of abusive behavior, "all of which occurred soon after plaintiff's initial complaints and continued until his discharge"). Plaintiffs can also attempt to show "inconsistencies" in Defendant's stated reasons for its actions. *LeBoon,* 503 F.3d at 232–33.

▮▮▮ If Plaintiffs can satisfy the elements of the prima facie case the analyses then diverge depending upon the types of evidence available. *See Monaco v. Am. Gen'l Assur. Co.,* 359 F.3d 296, 300 (3d Cir.2004). If there is direct evidence of retaliation, Defendant must demonstrate by a preponderance of the evidence "that it would have reached the same decision" absent Plaintiffs' protected conduct. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 261, 109 S.Ct. 1775, 1796, 104 L.Ed.2d 268, 296 (1989) (O'Connor, J., concurring); *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 146–47, 148 & n. 11 (3d Cir.2004) (citation omitted) (noting that the Third Circuit regards Justice O'Connor's concurrence in *Price Waterhouse* as controlling and applying *Price Waterhouse* to a claim for retaliation under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*); *Lackman v. Recovery Servs. of N.J., Inc.,* Civil Action No. 06–2016(RMB), 2008 WL 583660, at *6 n. 4, 2008 U.S. Dist. LEXIS, at *16 n. 4 (D.N.J. Feb.13, 2008) (noting that although *Price Waterhouse* has been overruled by Congressional action in the context of Title VII, "courts continue to use the ... analy-

sis in ... non-Title VII discrimination cases").

■ If, however, there is only circumstantial evidence of retaliation, Defendant need merely produce "legitimate, nondiscriminatory reason[s] for its actions." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 678 (1973); *Hicks v. Tech. Indus.*, 512 F.Supp.2d 338, 357 (W.D.Pa. 2007). If Defendant meets its burden of production, Plaintiffs must then show by a preponderance of the evidence that Defendant's "proffered explanation was false, and that retaliation was the real reason for the adverse ... action." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir.1997)). Inconsistencies in Defendant's explanations may be considered by the Court in its evaluation of both Plaintiffs' prima facie case and the validity of Defendant's explanations; there is nothing in *McDonnell Douglas* that "compartmentalize[s] the evidence so as to limits [sic] its use [to] only one phase of the case." *Farrell*, 206 F.3d at 286 (citing and quoting *Jalil*, 873 F.2d at 709 n. 6).

### Standing

■ Retaliation claims are available not only to the victims of the underlying discrimination; they also "extend to those who oppose discrimination against others." *Jackson*, 544 U.S. at 180–81, 125 S.Ct. at 1507, 161 L.Ed.2d at 374–75 (citation omitted). Although *Jackson* dealt with the travails of a school district employee, *Jackson*, 544 U.S. at 171, 125 S.Ct. at 1502, 161 L.Ed.2d at 369, there is nothing in *Jackson* or the statute itself that limits the universe of Title IX retaliation victims to the employees of a funding recipient. Parents of a student who have complained of sexual discrimination against that student are therefore not foreclosed from an action for retaliation. Claims for retaliation are, however, only available to those who have actually engaged in a protected activity themselves; Title IX does not extend this protection to the actor's friends and family. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 & n. 4, 568–70 (3d Cir. 2002);[63] *Washco v. Fed. Express Corp.*, 402 F.Supp.2d 547, 556 (E.D.Pa.2005) (citing *Fogleman*, 283 F.3d at 567–70).

### The District's loss of Dawn L.'s clearances

■ Speaking to the press in opposition to a funding recipient's acts of sexual discrimination is, as noted above, a protected act. Dawn L. engaged in such an act several times during the latter half of

---

**63.** *Fogleman* dealt with claims made under the anti-discrimination provisions of the Americans With Disabilities Act (hereinafter ADA), 42 U.S.C. § 12203(a); the Age Discrimination in Employment Act (hereinafter ADEA), 29 U.S.C. § 623(d); and the Pennsylvania Human Relations Act (hereinafter PHRA), 43 Pa. Cons.Stat. § 955(d). *Fogleman*, 283 F.3d at 567 & n. 4. Those statutes' anti-retaliation provisions are "nearly identical" to each other and to that of Title VII, and the Third Circuit has held that precedential interpretations of the anti-retaliation provisions of any one of the three federal laws—the ADA, ADEA, or Title VII—"are equally relevant to interpretation of the others." *Id.* (citing *Krouse*, 126 F.3d at 500).

*Fogleman* did ultimately grant standing to a son who had been fired, allegedly in retaliation for his father's protected acts. *Id.* at 571. This holding was based on a second anti-retaliation provision of the ADA, which made it illegal to "coerce, intimidate, threaten, or interfere with any individual ... on account of his ... having aided or encouraged any other individual in the exercise or enjoyment of, any right granted" by the ADA. *Id.* (quoting 42 U.S.C. § 12203(b)). As this provision has no analogue in Title VII or any Title IX case law of which the Court is aware, the Court finds it inapplicable to the instant case. *See id.* at 570 & n. 5, 571.

January, 2006. The Court finds that her loss of clearances and subsequent denial of the ability to engage in volunteer activities within the District might well have dissuaded a reasonable person in Dawn L.'s position—the position of someone who devoted more time to volunteering than would be required of a full-time paid employee—from engaging in the protected activity; the District's actions were therefore materially adverse. While it is impossible to pinpoint the date on which Dawn L. was first informed of the purported loss of the clearances and her resulting preclusion from any contact with District students, based on its review of the record the Court finds it more likely than not that the District knew of the interview and that Dawn L. was the interviewee at the time of its adverse actions.

Dawn L.'s relationship with the District had deteriorated since January of 2005, but the District's actions after the newscasts in January of 2006 represented a substantially heightened level of antagonism. The District's explanations for its actions are not credible. Dawn L. had obtained the very clearances the District claimed it did not have in its possession when she had been employed by the District as a teacher's aide. During her employment she had also volunteered with the District. Dawn L.'s period of employment ended approximately six months before the District adopted its volunteer clearance policy, but the Court has found no credible evidence that this would have invalidated her pre-existing clearances. There is, moreover, no credible evidence in the record to indicate the District had enforced its clearance policy against anyone except Dawn L. and Mr. G., a man who had, according to Parkins, a criminal

record for trespassing against the District. The Court finds ample reason to conclude that the District's actions were motivated by retaliatory animus.

There is only circumstantial evidence of retaliation by the District for Dawn L.'s media interviews; the *McDonnell Douglas* analysis therefore applies. As discussed above, Defendant's proffered reasons for its actions are not credible. The Court therefore finds that retaliation was in fact the real reason for the District's claimed loss of Dawn L.'s credentials and subsequent highly selective enforcement of its clearance policy, a policy that it had otherwise honored almost exclusively in the breach.

**Michael L.'s termination as scorekeeper and the District's subsequent refusal of payment**

 Unlike his wife, Michael L. did not engage in the protected act of speaking with the press prior to the filing of this lawsuit.[64] Plaintiffs have failed to establish that the District terminated Michael L. after he and Dawn L. filed the lawsuit on January 27, 2006. To the contrary, Michael L.'s testimony that he was fired as scorekeeper "right after" the January 13, 2006 broadcast of Dawn L.'s initial interview strongly suggests that he was fired before he and Dawn filed suit. Since Michael had not engaged in a protected act at the time he was terminated his claim for retaliatory termination must fail.

Plaintiffs have also not established when the District first refused to pay Michael L. for the games he had already worked. The record shows that Michael L. wrote to the District on May 15, 2006 to request payment and that the District refused, also in writing, on May 23, 2006. Ex. 15. Mi-

---

**64.** Michael L. also had no contact Buchko, Peterman, or Parkins regarding A.M.'s harassment of M.L. Vol. 5 p. 18; Joint Ex. 1 ¶ 14. Had he personally opposed the District's

indifference any such acts of opposition would also have been protected activities. *See Burlington,* 548 U.S. at 68, 126 S.Ct. at 2415, 165 L.Ed.2d at 360.

chael L. testified, however, that Coach Ravida told him that Ravida's initial request for payment for Michael L. had raised a "red flag" and precipitated Michael's termination, suggesting that payment was an issue from the time of his dismissal. Plaintiffs also introduced testimony from Penna's deposition in which he stated that when he instructed Ravida to fire Michael L., Penna also told Ravida that the District was not going to pay Michael L. for the games for which he had kept score.[65] It appears to the Court at least as likely as not that the District informed Michael of its refusal to pay before Michael and Dawn L. filed the instant suit. Since Plaintiffs have failed to establish that Michael L. had engaged in protected activity at the time of the District's initial refusal, Michael L.'s claim of retaliatory non-payment must also fail.

**Dawn and Michael's removal from their positions on the Big J's board**

As discussed in n. 52, *supra*, while the removal of Dawn and Michael L. from their positions as officers of the Big J may have been complete it was also, at least in the case of Michael L., less than formal; he received a letter addressed to him as president of the Big J as late as May 23, 2006. There is no dispute that the removal occurred after at least some of the newscasts containing the interviews with Dawn L. aired and that the District was aware both of their contents and that Dawn L. had been the interviewee. Plaintiffs have once again failed, however, to establish that the removal occurred after they actually filed suit, the first protected act involving both Dawn and Michael L. Indeed, Dawn L. testified that the conversation with Kim Garman, advising Dawn and Michael L. that they were being expelled from the board of the Big J, oc-

curred two days after Michael L. had been fired as scorekeeper, Vol. 3 p. 104, and the Court has already found that Michael L's termination could have occurred as much as two weeks before Dawn and Michael L. filed the instant suit. Since Plaintiffs have not shown that Michael and Dawn L.'s removal occurred after Michael L. had engaged in a protected act, his claim must fail here as well.

Dawn L. had, however, engaged in protected activity at the time of her removal. The next question before the Court is whether the actions of the Big J amounted to retaliation under Title IX. By themselves they were not. The Big J, although closely linked with the District, is a discrete organization which receives no federal funds. This does not, however, end the discussion; Title VII jurisprudence suggests that a broader analysis is required.

■■■ The "anti-retaliation provision [of Title VII] is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington*, 548 U.S. at 64, 126 S.Ct. at 2412–13, 165 L.Ed.2d at 357 (citation omitted). Instead, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington*, 548 U.S. at 63, 126 S.Ct. at 2412, 165 L.Ed.2d at 357 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1213 (D.C.Cir. 2006) (finding FBI retaliation against an employee where the FBI refused "to investigate death threats … against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (10th Cir. 1996) ("finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination")) (emphasis in origi-

---

**65.** Although Penna denied the accuracy of that statement at trial, the Court, as discussed earlier in this opinion, found Penna to be less than credible in general and on this point in particular. *See* n. 48, *supra*.

nal). The District's warning to the officers of the Big J that the District would "make it difficult" for the organization if Dawn and Michael L. were allowed to remain, Vol. 74 p. 13, was likewise an action taken by the District to cause Dawn L. harm outside the District.[66] Indeed, in light of the symbiotic relationship between the Big J and the District, in which the Big J operated on District property to raise money which was either paid directly to the District or used to help fund the extracurricular activities of District students, and where Big J members were subject to the District's rules and policies, including those regarding clearances, the District barely had to reach outside itself at all in this attempt to punish Dawn L.[67]

■ Removal from a position in the Big J, the premier volunteer organization affiliated with the District, would certainly have deterred a reasonable individual in Dawn L.'s position—that of a hyper-committed volunteer—from opposing unlawful discrimination. The Court need not infer a causal link; after attending a school board meeting at which the matter was discussed, Garman told Dawn L. that the District's decision was motivated by the lawsuit.[68] Under *Price Waterhouse*, such direct evidence of retaliatory animus then shifts the burden of persuasion to Defendant, who must prove that it would have insisted that Dawn be removed from her position with the Big J even if she had not filed the lawsuit. *See Conoshenti*, 364 F.3d at 147 (citations omitted).

Defendant attempted to meet its burden primarily through the testimony of Karen Gojmerac, who stated that the officers of the Big J decided on their own to remove both Dawn and Michael L. from the board of the organization due to Dawn L.'s lack of clearances. Vol. 5 p. 98. As illustrated at length in n. 53, *supra*, Gojmerac's testimony was inconsistent to the point of incoherence and not remotely credible. Michael L. had valid clearances at the time of his removal from the board, and Defendant never offered a plausible explanation for why, if Dawn L.'s clearances were a problem, Michael had to be removed as well. Moreover, if clearances had been the actual motivating factor the Big J's board

**66.** Defendant seeks to apply First Amendment jurisprudence to the case at bar. Document No. 78 ¶ 159 (citing *McLaughlin v. Watson*, 271 F.3d 566 (3d Cir.2001); *Morrison v. City of Reading*, 2007 WL 764034 (E.D.Pa.2007)). The Court need not, however, address the applicability of First Amendment case law to Title IX. The gravamen of Defendant's argument is that, when alleging third-party retaliation, Plaintiffs must prove that Defendant "coerced or threatened" the third party. *Id.; see also McLaughlin*, 271 F.3d at 573 (citing *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir.1984)). The Court has no trouble finding that the school board's warning to the Big J's board members that if they did not remove Dawn and Michael L. the District would begin actively enforcing its clearance policy, where it was common knowledge that so few Big J volunteers had the necessary clearances that such enforcement would have made it impossible for the Big J to function, constituted coercion or threat as proscribed by *McLaughlin* and *Maxwell*.

**67.** By pointing out the closeness of the relationship between the District and the Big J the Court does not mean to imply that a parent/subsidiary relationship automatically renders the parent liable for the actions of its subsidiary. *See* 5 Emp. Coord. Employment Practices § 20:7 (citing *Brown v. Fred's, Inc.*, 494 F.3d 736 (8th Cir.2007)) (discussing Title VII and stating that "[t]here is a strong presumption that a parent company is not the employer of its subsidiary's employees, for the purpose of a ... discrimination claim, and the courts will find otherwise only in extraordinary circumstances").

**68.** The Court notes that Defendant raised no objection to the admission of this evidence, *see* Vol. 3 p. 104; Vol 4 pp. 180–81, and, indeed, engaged in its own questioning of Dawn L. regarding Garman's statements. Vol. 4 pp. 13, 16–17.

would also have removed another officer, Philip Garman, who did not receive school board approval as a volunteer until March 6, 2006, over a month after Dawn L. had been removed as co-secretary and, coincidentally, the same day as Dawn L. received her own post-removal approval. Defendant has failed to meet its burden of persuasion and the Court therefore finds that Defendant engaged in prohibited retaliation under Title IX when it coerced the Board of the Big J into removing Dawn L. as an officer of that organization.[69]

**The District's failure to notify M.L. and B.L. of their membership in the Junior National Honor Society**

 Dawn L. engaged in protected acts when she opposed the District's indifference to A.M.'s ongoing sexual harassment of M.L.; the District was aware of Dawn's opposition; and Dawn's opposition preceded the District's failure to notify M.L. of her pending induction into the Junior National Honor Society. Both Dawn and Michael L. engaged in a protected act when they filed the instant lawsuit; the District was aware of the lawsuit; and the filing of the lawsuit preceded the District's failure to notify B.L. of his pending induction into the Junior National Honor Society. The Third Circuit has held, however, that under the retaliation analysis applicable to Title IX the sins of the parents may indeed by visited upon their children and only the "actual person who engaged in protected activity" is pro-

tected from retaliation for that activity. *Fogleman,* 283 F.3d at 564 & n. 1, 567–70.

To the extent that Dawn and Michael L. have claimed that the District retaliated against them by its failure to notify either child their claims must fail. To the extent that the District may have retaliated against M.L. for her participation in the investigation of A.M.'s actions,[70] the Court notes that M.L. is not named as a plaintiff in the retaliation count of the amended complaint, *see* Document No. 12, p. 10, and that question is therefore not before the Court.

**Constructive expulsion**

Dawn and Michael L. have argued that they "were forced to enroll their children in parochial school because they feared that their children would be victims of retaliation." Document No. 79 p. 11 ¶ 8. There are several problems with this argument. First, the claim in fact only encompasses Dawn and Michael's daughters; their son, B.L., still attends school within the District. More significantly, Title IX, as discussed above, does not recognize an action sounding in retaliation where the alleged victim of the retaliation was not the person who engaged in the protected act, and therefore attempts by the District to punish Dawn and Michael L. through injury to their children do not, at least within the Third Circuit, violate Title IX. *See Fogleman,* 283 F.3d at 567–70. Finally, Plaintiffs have neither cited to nor is the Court aware of any case that allows for

**69.** The Court notes that the illogic and inconsistency of the District's proffered explanations for Dawn L.'s removal were also sufficient to have allowed Dawn to meet her ultimate burden of proving retaliation under a *McDonnell Douglas* analysis. *See Farrell,* 206 F.3d at 286.

**70.** *Jackson* directly confers Title IX protection only to those who complain of sex discrimination; it makes no mention of protection for

participants in the investigation of charges of discrimination. *See generally Jackson,* 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361. Under the circumstances of the case at bar, the Court need not decide whether Title IX adopts the portion of the Title VII anti-retaliation provision, 42 U.S.C. § 2000e–3(a), that prohibits retaliation against a person who has "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title IX.

recovery under Title IX of damages for hypothetical future retaliation where there has been no showing of past or present retaliation against the prospective victims.

There is no evidence that C.L. or N.L. ever engaged in actions protected by Title IX; they could, therefore, never have been subjected to actionable retaliation under the statute. To the extent that M.L.'s participation in the investigation of her harassment by A.M. might have resulted in retaliation cognizable under Title IX, her participation had ended in the spring of 2005, and the District's retaliation against M.L. extended at most to its failure to notify her of her pending induction into the Junior National Honor Society,[71] a claim not even raised by Plaintiffs. There is no evidence that M.L. engaged in any other protected activity or suffered other acts of possible retaliation before her transfer to Bishop McCort at the end of the following year.

■ Dawn and Michael L.'s argument could also be viewed as a claim for constructive expulsion, in effect alleging that the relationship between the L. family and the District had become so poisonous by February of 2006 that Dawn and Michael L. had no alternative but to remove their daughters to another school. So far as the Court can determine, such a claim would constitute a matter of first impression within the federal system. That is not necessarily an obstacle; Title IX freely borrows the jurisprudence of Title VII and the courts have long recognized an analogous cause of action for constructive discharge under Title VII. See Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887 (3d Cir. 1984) (citations omitted) (collecting cases).

■ Proof of "unfair and unwarranted treatment" is not enough to estab-lish a claim of constructive discharge, Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir.1993); a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204, 220 (2004) (citations omitted); Hill v. Borough of Kutztown, 455 F.3d 225, 232 & n. 7 (3d Cir.2006) (citing Suders, 542 U.S. at 141, 124 S.Ct. 2342, 159 L.Ed.2d 204). Although it is possible to make out a claim for constructive discharge without establishing a traditional hostile working environment, see Stremple v. Nicholson, 289 Fed.Appx. 571, 573 (3d Cir.2008) (not precedential); see also Clowes, 991 F.2d at 1161, the instant case, grounded as it is in Plaintiffs' claims of ongoing hostile actions by the District, does warrant hostile environment analysis. See Saxe, 240 F.3d at 206 (finding harassment under Title IX to be analogous to creation of a hostile working environment). A finding of hostile environment is not, however, sufficient by itself to support a finding of constructive discharge; "the plaintiff must [instead] demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile ... environment." Spencer v. Wal–Mart Stores, Inc., 469 F.3d 311, 316 n. 4 (3d Cir.2006) (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir.1992)); see also Suders, 542 U.S. at 146, 124 S.Ct. at 2354, 159 L.Ed.2d at 219 (characterizing Suders's claim for constructive discharge as "an aggravated case of sexual harassment or hostile work environment") (emphasis added).

Regardless of the potential viability of a cause of action for constructive expulsion

---

**71.** The District also failed to notify B.L. B.L. had not, however, engaged in any protected activity and, in any event, the District's failure to notify B.L. occurred after his sisters had withdrawn from the District and therefore could not have influenced Dawn and Michael L.'s decision to remove their daughters.

in general, the Court finds the concept largely redundant in the context of the case at bar. Title IX already provides remedies for student-on-student sexual harassment and retaliation. *Jackson*, 544 U.S. at 173, 184, 125 S.Ct. at 1504, 1510, 161 L.Ed.2d at 370, 377 (citations omitted). In cases seeking recovery of tuition payments where the plaintiff has, in response to harassment, transferred from a funding recipient to another school, the Court does, however, find it appropriate to import the requirement that the plaintiff show harassment so severe as to have compelled a reasonable victim of such harassment to withdraw from the funding recipient and continue her education elsewhere. Similarly, in a claim seeking compensation for tuition due to a funding recipient's allegedly retaliatory behavior, the Court will require a showing of retaliation against the student who transferred—retaliation against non-actors not being cognizable under Title IX—so severe as to have compelled the transfer.

However much Dawn and Michael may have wanted to remove their daughters from the District, and however much their daughters may have wanted to leave, Plaintiffs in the case *sub judice* cannot show compulsion. A.M.'s harassment of M.L. had ceased by April of 2005 and M.L. attended school within the District during the 2005–2006 school year without actionable incident. There is no evidence that either of M.L.'s sisters were ever harassed by A.M. or anyone else. Assuming without deciding that the District retaliated against M.L. for her involvement in the investigation of A.M.'s actions, the District's failure to notify her of her pending induction into the Junior National Honor Society was as trivial and petty as so much of middle school itself; it certainly could not have compelled her transfer to Bishop McCort.

**Conclusion**

The District retaliated against Dawn L. in violation of Title IX when it claimed to have lost her clearances and subsequently selectively enforced its clearance policy against her, thus preventing her from engaging in volunteer work within the District that involved contact with students for a period of approximately two months. The District also retaliated against Dawn L. when it coerced the board of the Big J into removing her from her position as co-secretary. The District's remaining actions, including its termination and non-payment of Michael L.; its involvement with Michael L.'s removal as president of the Big J; and its failure to inform M.L. and D.L. of their pending inductions into the Junior National Honor Society did not violate Title IX. Plaintiffs' claim for constructive expulsion also fails.

## C. DAMAGES

### Types of damages

■■■ The courts have long held that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Franklin*, 503 U.S. at 66, 112 S.Ct. at 1033, 117 L.Ed.2d at 217 (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). In cases such as those brought under Title IX, where the statute in question was enacted pursuant to the power granted the Congress by the Spending Clause, U.S. Const., Art. I, § 8, cl. 1, the available remedies are, however, less broad than the preceding quote might suggest. *See Barnes v. Gorman*, 536 U.S. 181, 185–86, 122 S.Ct. 2097, 2100–01, 153 L.Ed.2d 230, 236 (2002) (citing *Davis*, 526 U.S. at 640, 119 S.Ct. 1661, 143 L.Ed.2d 839) (applying the Title IX jurisprudence of *Davis* to a case brought under Title VI

of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and noting that the Supreme Court "has interpreted Title IX consistently with Title VI"). The courts have viewed "Spending Clause legislation as 'much in the nature of a *contract:* in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Barnes,* 536 U.S. at 186, 122 S.Ct. at 2100–01, 153 L.Ed.2d at 236 (quoting *Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)) (alteration and emphasis in *Barnes* ). For the recipient to be held liable, it must therefore have notice of the nature of that liability at the time it accepts federal funds. *Barnes,* 536 U.S. at 187, 122 S.Ct. at 2101, 153 L.Ed.2d at 237; *see also Hadley v. Baxendale,* 156 Eng. Rep. 145 (Ex. 1854) (finding liability in a breach of contract case only for damages "arising naturally" from the breach itself or from special circumstances known to both parties at the time of the contract's formation); Restatement (Second) of Contracts § 351 (1981) (finding no liability for damages which "the party in breach did not have reason to foresee as a probable result of the breach when the contract was made").

■ A recipient "generally" has sufficient notice of liabilities imposed by both the "relevant legislation" and "those remedies traditionally available in suits for breach of contract." *Barnes,* 536 U.S. at 187, 122 S.Ct. at 2101, 153 L.Ed.2d at 237. As a consequence, even though Title IX "contains no express remedies," compensatory damages and injunctive relief, which are traditional remedies for breach of contract, are nonetheless available. *Id.* (citations omitted). By contrast, punitive damages, which are not traditionally available in cases of breach of contract and, moreover, are of "indeterminate magnitude," *i.e.,* unpredictable, are also not available for violations of Title IX. *Barnes,* 536 U.S. at 187–88, 122 S.Ct. at 2101–02, 153 L.Ed.2d at 237–38.

■ Whether Title IX allows damages for emotional distress is a harder question. "Mental suffering ... is not generally considered as a basis for compensation in contractual actions." 24 Richard A Lord, Williston on Contracts § 64:7 (4th ed. updated 2008) [hereinafter Williston]. The "contract-law analogy" cannot be taken too far, however, since it "may fail to give such helpfully clear answers [as it did to the question of punitive damages] to other questions that may be raised by actions for private recovery under the Spending Clause legislation...." *Bowers v. Nat'l Collegiate Athletic Ass'n,* 346 F.3d 402, 430 (3d Cir.2003) (quoting and "shar[ing] the sentiment" of two of the concurring Justices in *Barnes,* 536 U.S. at 190–91, 122 S.Ct. at 2103, 153 L.Ed.2d at 239 (Souter, J., and O'Connor, J., concurring)). At base, the contract analogy is merely shorthand for the precept that the "task for the courts is to ... hold [funding] recipients to the terms of their bargain but not to impose conditions of which the recipient could not fairly have been aware." *Id.;* *see also Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1198 (11th Cir. 2007) (finding that the "central reason" for the contract analogy in *Barnes* was the Supreme Court's "concern with ensuring ... fair notice" of liability to funding recipients).

■ It is "fairly obvious" that civil rights violations can engender emotional distress. *Id.* at 1198–99 (collecting cases); *see also Gunby v. Pennsylvania Elec. Co.,* 840 F.2d 1108, 1121 (3d Cir.1988) (citing *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225, 1238 (D.C.Cir.1984); *Williams v. Trans World Airlines,* 660 F.2d 1267, 1272 (8th Cir.1981)) (holding that "emotional pain and suffering" are compensable under 42 U.S.C. § 1981); Harassment Guidance,

at ii, *http://www.ed.gov/about/offices/list/ ocr/docs/shguide.pdf* (stating that "sexual harassment ... can interfere with a student's ... emotional ... well-being"). Emotional distress is, therefore, a "foreseeable consequence" of a recipient's violation of the terms under which it accepted federal funds. *Sheely,* 505 F.3d at 1198; *see also Mansourian v. Bd. of Regents,* No. CIV. 2–03–02591–FCD–EFB, 2007 WL 3046034, at \*14, 2007 U.S. Dist. LEXIS, at \*44–45 (E.D.Cal. Oct.18, 2007) (citing *Davis,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839; *Gebser,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277; *Franklin,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208) (finding that "the Supreme Court has implicitly approved of damages claims for emotional distress in sexual harassment claims brought pursuant to Title IX"). Moreover, contract law itself does not completely foreclose recovery for emotional damages in the event of a breach. *See Sheely,* 505 F.3d at 1200–01 (citations omitted); *see also Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 147 (3d Cir.2000) (citations omitted) (noting, however, that in Pennsylvania the possibility of recovery is limited to cases alleging "physical injury or physical impact"); [72] Restatement of Contracts (Second) § 353 (1981) (allowing recovery for emotional disturbance where "the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result"); 24 Williston § 64:7 (4th ed. updated 2008) (suggesting that "perhaps a majority of courts would today follow the Restatement (Second)[ ]"; noting that there are "numerous cases allowing" recovery; and further noting that such cases "invariably deal[ ] with ... peculiarly sensitive subject matter, noncommercial undertakings, or both"). In light of the above, the Court finds that a funding recipient has sufficient notice that its violation of its obligations under Title IX could lead to emotional distress in the subjects of such violation, and that recovery for emotional distress is not automatically foreclosed in the instant case.

■ However likely emotional distress may be, the Court may not award speculative damages; there must be "direct and substantial evidence of humiliation or emotional injury." *Gunby,* 840 F.2d at 1121–22; *see also Chainey v. Street,* 523 F.3d 200, 216 (3d Cir.2008) (citing *Gunby,* 840 F.2d at 1121; *Spence v. Bd. of Educ. of Christina Sch. Dist.,* 806 F.2d 1198, 1200 (3d Cir.1986)); *Bolden v. Se. Pa. Transp. Auth.,* 21 F.3d 29, 33–34, 36 (3d Cir.1994) (requiring evidence of actual injury). That evidence need not include expert testimony and, indeed, no "specific type of evidence" is required to establish the injury. *Bolden,* 21 F.3d at 34, 36 (citing and quoting *Carey v. Piphus,* 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978), for the proposition that, "[a]lthough essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others").

### M.L.'s injuries

■ M.L. was clearly harmed by A.M.'s conduct. Most of that injury occurred before January 14, 2005, the date of

---

**72.** Not too much should be read into the apparent limitations on recovery under Title IX suggested by *Nicholas.* As discussed above, contract analysis is not necessarily binding on determination of liability under Title IX; it is merely an apt metaphor. *See Bowers,* 346 F.3d at 430. Laws such as Title IX are, moreover, "intended in part to provide broad, consistent recompense for violations of civil rights" and their purpose "would be frustrated" if their enforcement were to vary from state to state depending upon the forum's own laws. *Bolden v. Se. Pa. Transp. Auth.,* 21 F.3d 29, 35 (3d Cir.1994) (citations omitted).

the District's first notice of the harassment, and hence the date of its first liability. Had the District responded in a reasonable fashion to that initial notice M.L. would not, however, have been subjected to sexual assault by A.M. in the middle school bathroom on January 18, 2005 or the lewdly harassing notes A.M. passed her on January 19 and 21, 2005. Had the District responded in a reasonable fashion to either the January 14 or January 21 notices, M.L. would not have been deprived of the opportunity to attend the middle school from January 21, 2005 until March 15, 2005. Had the District responded in a reasonable fashion to subsequent notices on February 3, 7, and 10, 2005, M.L.'s period of absence would at least have been shorter than it was and M.L. would have been spared A.M.'s harassing note from March 23, 2005. The Court finds that M.L. was damaged by these injuries in the amount of $22,000 and the District is liable for that sum.

M.L. also suffered emotional injury. Much of that harm, including M.L.'s depression and possible suicidal ideation in the early months of 2005, stemmed from her parents' discovery of the sexual assaults to which she was being subjected by A.M. and the subsequent forced termination of the girls' relationship; it would therefore have occurred even if the District had acted reasonably from the time of its initial notice of the harassment. M.L.'s injuries during this period were, however, exacerbated by the District's unreasonable action of providing M.L.'s parents with no alternative but to remove her from the middle school and place her on homebound instruction. M.L. viewed homebound instruction as "punishment," and Michael L. testified to its emotional impact on M.L. as follows:

> And with the situation going on with her homebound M.L. was actually locking down, she was without any friends or even her little core group. She was actually going back inside a shell that was probably worse than I had ever seen M.L. in her entire life. And I, I had no idea what was going to happen and how worse, how bad that was going to get.
>
> So [Dawn and Michael] felt that meeting with all the teachers and everything like that [in preparation for M.L.'s return to the middle school], that would be better off than just having M.L. at home rotting away inside herself.

Vol. 5 p. 19.

The Court finds the above testimony to be sufficient to establish emotional injury to M.L. due to the District's unreasonable response to its multiple notices of harassment; that the amount of this injury was $5,000; and that the District is therefore liable for that sum.

### Dawn L.'s injuries

 The Court has already determined that Dawn L. had valid clearances at the time the District claimed that she did not. Dawn L. had to bear the expense of reapplying for those clearances to be able to continue her volunteer work involving contact with District students. Plaintiffs have not, however, furnished any evidence regarding the amount of Dawn L.'s expenditure and "damages cannot be based on sheer speculation...." *Jackson & Coker, Inc. v. Lynam,* 840 F.Supp. 1040, 1052 (E.D.Pa.1993).

The Court finds that the two-month enforced hiatus in Dawn's volunteer activities engendered by the District's highly selective enforcement of its clearance policy, while admittedly "a slap in the face," Vol. 3 p. 142, was only minimally damaging. However, when taken with the District's coerced removal of Dawn L. from the board of the Big J, a position which was in many ways the apotheosis of parental volunteerism within the District and of particular significance to someone like Dawn

L. who had devoted thousands of hours to volunteer activities, the Court finds that more than nominal damages are in order; that the District's retaliatory actions injured Dawn L. in the amount of $1,000; and that the District is therefore liable for that sum.

Dawn L. has also claimed emotional injury. Beyond her testimony that her treatment by the District was "a slap in the face" and made her so angry that she wanted to use "foul language" to describe her feelings, *id.* at 126, 142, Plaintiffs have, however, presented no evidence that Dawn L. suffered emotional damage from the District's retaliation. In *Gunby*, the plaintiff testified that he "had been done wrong"; "treated unfairly"; and "treated unjustly," and another witness testified that the plaintiff had been "very upset" when informed by his employer of an adverse decision. *Gunby*, 840 F.2d at 1120. That was not sufficient evidence to establish mental distress in *Gunby*, *id.* at 1121–22, and Plaintiffs have offered even less evidence of Dawn L.'s distress in the instant case. The Court therefore finds that Plaintiffs have not met their burden in Dawn L.'s claim for emotional distress.

### Equitable relief

■ Plaintiffs have also asked the Court to "enjoin the School District to enact, adopt, and enforce adequate policies, procedures, and practices to ensure that students are not subjected to peer-on-peer sexual harassment. . . ." Document No. 12 p. 15. Based on the evidence, the Court finds that the District's existing policies, if followed, are sufficient to protect other students from peer-on-peer sexual harassment within the meaning of Title IX. The problem, as painfully illustrated by the District's actions in the case *sub judice*, is that the administration of these policies has been woefully inadequate. For the Court to order the District to comply with its pre-existing policies would inevitably insert the Court into the day-to-day administration of the District; a position that would be as inappropriate as it would be inimical to the efficient operation of the Court. The Court is confident that the pedagogical value of this opinion will not escape either the District's administrators or its board of directors, and that in the future they will conduct themselves in such a way as to obviate any discussion of injunctive relief.

### Costs of litigation

■ Costs other than attorney's fees should generally be allowed to the prevailing parties. Fed.R.Civ.P. 54(d)(1). Dawn and Michael L. are parties in their own right in their retaliation claims. They have also sued on behalf of their minor daughter, M.L. Fed.R.Civ.P. 17(a)(1)(C) allows them to do so in their own names; Dawn and Michael L. are the real parties in interest in M.L.'s claims as well. On balance, Dawn and Michael L. are the prevailing parties in this case; although they did not win all their claims they won more than enough. 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2667 (current through 2008 update); *see also Farrar v. Hobby*, 506 U.S. 103, 105, 109, 113 S.Ct. 566, 570, 572, 121 L.Ed.2d 494, 502 (1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (citation and internal quotation marks omitted)) (noting, for purposes of awarding attorney's fees under 42 U.S.C. § 1988, that "plaintiffs may be considered prevailing parties . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," and finding that even an award of nominal damages is sufficient to confer prevailing party status on a civil rights plaintiff).

 The Court may also, "in its discretion," allow the prevailing parties "reasonable attorney's fee[s] as part of the costs" of litigation. 42 U.S.C. § 1988(b). In cases such as this, however, where the substantive law does not require that fees be proven at trial, "[a] claim for attorney's fees ... must be made by motion...." Fed.R.Civ.P. 54(d)(2)(A); *see also* 42 U.S.C. § 1988. The Court will therefore make no decision regarding attorney's fees pending such motion.

## III CONCLUSION

Michael and Dawn L., as representatives of their minor daughter, M.L., and in their own capacities, have been damaged in the amount of $28,000, and the District is therefore liable to them for that amount. Since Dawn and Michael are the prevailing parties in this lawsuit, costs of the litigation other than attorney's fees shall also be taxed to the District. The Court will not decide the issue of attorney's fees prior to Plaintiffs' motion pursuant to Fed.R.Civ.P. 54(d)(2)(A). An appropriate order follows.

### *ORDER*

**AND NOW,** this _____ day of November, 2008, the Court having made the foregoing findings of fact and conclusions of law, it is **HEREBY ORDERED** as follows:

1. Judgment shall be entered in favor of Plaintiffs and against Defendant in the amount of $27,000 for damages to M.L.

2. Judgment shall be entered in favor of Dawn L. and against Defendant in the amount of $1,000 for damages to Dawn L.

3. Judgment shall be entered in favor of Defendant and against Michael L. for Michael L.'s claims on his own behalf.

4. Costs of the litigation other than attorney's fees shall be taxed to the Defendant.

5. The Court shall address the issue of attorney's fees upon motion pursuant to Fed.R.Civ.P. 54(d)(2).